IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

NORTH CAROLINA STATE CONFERENCE OF THE NAACP, *et al.*,

Plaintiffs-Appellants

JOHN DOE, *et al.*,

Plaintiffs

v.

PATRICK LLOYD MCCRORY, in his Official Capacity as Governor of North
Carolina, *et al.*,

Defendants-Appellees

(*See inside cover for continuation of caption*)
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
_____

BRIEF FOR THE UNITED STATES AS APPELLANT
_____

RIPLEY RAND
 United States Attorney for the
  Middle District of North Carolina

GILL P. BECK
 Special Assistant United States Attorney
  for the Middle District of North Carolina
 100 Otis Street
 Asheville, NC  28801
 (828) 259-0645

GREGORY B. FRIEL
JUSTIN LEVITT
 Deputy Assistant Attorneys General

DIANA K. FLYNN
CHRISTINE H. KU
ANNA M. BALDWIN
 Attorneys
 Department of Justice
 Civil Rights Division, App. Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, DC  20044-4403
 (202) 353-9044

(*Continuation of caption*)

LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, *et al.*,

Plaintiffs-Appellants

CHARLES M. GRAY,

Intervenors/Plaintiffs

LOUIS M. DUKE, *et al.*,

Plaintiffs-Intervenors-Appellants

v.

THE STATE OF NORTH CAROLINA, *et al.*,

Defendants-Appellees

_____

LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, *et al.*,

Plaintiffs-Appellants

LOUIS M. DUKE, *et al.*,

Intervenors/Plaintiffs

v.

THE STATE OF NORTH CAROLINA, *et al.*,

Defendants-Appellees

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

THE STATE OF NORTH CAROLINA, *et al.*,

Defendants-Appellees

CHRISTINA KELLEY GALLEGOS-MERRILL, *et al.*,

Intervenors/Defendants

# TABLE OF CONTENTS

PAGE

STATEMENT OF JURISDICTION..........................................................................1

STATEMENT OF THE ISSUES...........................................................................2

STATEMENT OF THE CASE..............................................................................2

STANDARD OF REVIEW ..................................................................................8

SUMMARY OF THE ARGUMENT ....................................................................9

ARGUMENT

    I     THE DISTRICT COURT COMMITTED SEVERAL
          ERRORS OF LAW IN ANALYZING WHETHER
          HB 589 WAS ENACTED WITH DISCRIMINATORY
          INTENT............................................................................................11

          A.    *By Failing To Consider The Legislature's Actions
                 In The Context Of "A Troubling Blend Of Politics
                 And Race," The District Court Erred By Omitting
                 A Critical Component Of The Discriminatory Intent
                 Analysis* ...................................................................13

          B.    *The District Court Erred By Engaging In A
                 "Rational Basis"-Type Review Of Possible
                 Motivations, Instead Of Reviewing The Actual
                 Justifications, Or Absence Thereof, Proffered
                 By The Legislature* ...................................................19

          C.    *The District Court Erred By Improperly Disregarding
                 Or Ignoring Broad Categories Of Significant Intent
                 Evidence* ...................................................................25

1. *The District Court Improperly Disregarded Evidence Showing That The Legislature Had Actively Sought Racial Data That Showed HB 589's Disparate Racial Impacts And Then, With This Knowledge, Had Presented And Adopted The Bill* ..........................................................25

2. *Despite This Court's Express Guidance In The Initial Appeal, The District Court Continued To Erroneously Downplay North Carolina's History Of Voting Discrimination* ..............................................28

3. *The District Court Improperly Rejected Plaintiffs' Expert Testimony Regarding Discriminatory Intent* ......................................30

II. THE DISTRICT COURT FAILED TO PROPERLY APPLY THE SECTION 2 RESULTS TEST ....................................31

A. *The District Court Gave Impermissible Weight To Evidence Regarding 2014 Turnout* ....................................34

1. *The District Court Erred In Elevating The Importance Of A Single Aggregate Turnout Comparison Above All Other Evidence* .........................36

2. *The District Court Erred In Failing To Note The Limited Probative Value Of Midterm Election Turnout Data As Compared To Presidential Year Impact* .................................42

3. *The District Court Compounded The Error Of Its Overemphasis On Turnout By Misstating Relevant Testimony On The Subject* ...............................45

B. *The District Court Misapplied This Court's Instructions For Determining What Constitutes A "Discriminatory Burden" Under Section 2* ..........................47

    1. *The District Court Improperly Discounted Evidence Of Burden Based On The Number Of Voters Affected*............................................................47

    2. *The District Court Ignored Evidence Of Burden Where The Right To Vote Was Not Completely Foreclosed* ....................................49

C. *The District Court Failed To Correctly Apply The Legal Framework For Determining Whether A Burden Is Caused By Or Linked To The Social And Historical Legacy Of Race Discrimination* ......................50

    1. *The District Court Improperly Imposed A Heightened Causation Standard*....................................51

    2. *The District Court Erred In Its Consideration Of The Tenuousness Factor*...........................................56

D. *The District Court's Alternative Holding That Plaintiffs' Section 2 Results Claim Had No Proper Remedy Infected The Entirety Of Its Liability Analysis*......................................................................57

CONCLUSION ....................................................................61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:** **PAGE**

*Baird* v. *Consolidated City of Indianapolis*,
976 F.2d 357 (7th Cir. 1992), cert. denied, 508 U.S. 907 (1993) ................38

*Bolden* v. *City of Mobile*, 542 F. Supp. 1050 (S.D. Ala. 1982)................................30

*Carrington* v. *Rash*, 380 U.S. 89 (1965)................................................56

*Chisom* v. *Roemer*, 501 U.S. 380 (1991) ................................................40

*Collins* v. *City of Norfolk*, 883 F.2d 1232 (4th Cir. 1989),
cert. denied, 498 U.S. 938 (1990)................................................38

*Crawford* v. *Marion Cnty. Election Bd.*, 553 U.S. 181 (2008)........................ 24-25

*Dillard* v. *Crenshaw Cnty.*, 640 F. Supp. 1347 (M.D. Ala. 1986) ........................30

*Federal Trade Comm'n* v. *Ross*, 743 F.3d 886 (4th Cir.),
cert. denied, 135 S. Ct. 92 (2014)................................................8

*Florida* v. *United States*, 885 F. Supp. 2d 299 (D.D.C. 2012) ................................48

*Frank* v. *Walker*, No. 15-3582, 2016 WL 1426486 (7th Cir. Apr. 12, 2016) ........49

*Gaffney* v. *Cummings*, 412 U.S. 735 (1973)................................................56

*Garza* v. *County of L.A.*, 918 F.2d 763 (9th Cir. 1990),
cert. denied, 498 U.S. 1028 (1991)................................ 18-19, 30

*Gomillion* v. *Lightfoot*, 364 U.S. 339 (1960)................................................56

*Gonzalez* v. *Arizona*, 624 F.3d 1162 (9th Cir. 2010),
aff'd, 133 S. Ct. 2247 (2013)................................................33

*Hines* v. *Mayor of Ahoskie*, 998 F.2d 1266 (4th Cir. 1993) ................................38

*Holder* v. *Hall*, 512 U.S. 874 (1994) ................................................ 58-59

**CASES (continued):**                                                      **PAGE**

*Hunter* v. *Underwood*, 471 U.S. 222 (1985) .............................................. 13, 20, 23

*Johnson* v. *De Grandy*, 512 U.S. 997 (1994) ................................................... 33, 35

*Johnson* v. *Hamrick*, 296 F.3d 1065 (11th Cir. 2002)............................................38

*Kirksey* v. *Board of Supervisors*, 554 F.2d 139 (5th Cir.) (en banc),
    cert. denied, 434 U.S. 968 (1977)..................................................................52

*League of United Latin Am. Citizens* v. *Perry*, 548 U.S. 399 (2006)................ 17-18

*League of United Latin Am. Citizens, Council No. 4434* v. *Clements*,
    999 F.2d 831 (5th Cir. 1993) (en banc),
    cert. denied, 510 U.S. 1071 (1994).............................................40, 53-54, 57

*League of Women Voters of N.C.* v. *North Carolina*,
    769 F.3d 224 (4th Cir. 2014), cert. denied, 135 S. Ct. 1735 (2015) ..... *passim*

*McMillan* v. *Escambia Cnty.*, 748 F.2d 1037 (5th Cir. 1984) .................................29

*Merritt* v. *Old Dominion Freight Line, Inc.*, 601 F.3d 289 (4th Cir. 2010) ...........26

*Mississippi State Chapter, Operation PUSH* v. *Allain*,
    674 F. Supp. 1245 (N.D. Miss. 1987),
    aff'd, 932 F.2d 400 (5th Cir. 1991) ..............................................................51

*Mississippi State Chapter, Operation PUSH, Inc.* v. *Mabus*,
    932 F.2d 400 (5th Cir. 1991) ............................................................. 38-39, 51

*North Carolina State Conference of the NAACP* v. *McCrory*,
    997 F. Supp. 2d 322 (M.D.N.C. 2014) ...........................................................7

*North Carolina* v. *League of Women Voters of N.C.*, 135 S. Ct. 6 (2014)...............7

*Ohio State Conference of the NAACP* v. *Husted*,
    768 F.3d 524 (6th Cir.), vacated, No. 14–3877,
    2014 WL 10384647 (6th Cir. Oct. 1, 2014) ..................................... 34, 47, 58

*Personnel Adm'r of Mass.* v. *Feeney*, 442 U.S. 256 (1979)............................. 16, 20

**CASES (continued):**                                               **PAGE**

*Reno* v. *Bossier Parish Sch. Bd.*, 520 U.S. 471 (1997) ...........................................16

*Reno* v. *Bossier Parish Sch. Bd.*, 528 U.S. 320 (2000) ..........................................60

*Rogers* v. *Lodge*, 458 U.S. 613 (1982) .......................................................... 13, 19

*Ruiz* v. *City of Santa Maria*, 160 F.3d 543 (9th Cir. 1998),
    cert. denied, 527 U.S. 1022 (1999)..................................................................38

*Salas* v. *Southwest Tex. Junior Coll. Dist.*, 964 F.2d 1542 (5th Cir. 1992) ...........40

*Shelby Cnty.* v. *Holder*, 133 S. Ct. 2612 (2013) .......................................... 2, 39, 59

*Smith* v. *Brunswick Cnty.*, 984 F.2d 1393 (4th Cir. 1993)......................................40

*Solomon* v. *Liberty Cnty.*, 957 F. Supp. 1522 (N.D. Fla. 1997),
    aff'd, 221 F.3d 1218 (11th Cir. 2000) ............................................................40

*Teague* v. *Attala Cnty.*, 92 F.3d 283 (5th Cir. 1996),
    cert. denied, 522 U.S. 807 (1997)..................................................................38

*Terrazas* v. *Clements*, 581 F. Supp. 1329 (N.D. Tex. 1984) ..................................56

*Thornburg* v. *Gingles*, 478 U.S. 30 (1986)....................................................... *passim*

*United States* v. *Brown*, 561 F.3d 420 (5th Cir. 2009) ............................................19

*United States* v. *Harvey*, 532 F.3d 326 (4th Cir. 2008) ............................................9

*United States* v. *Marengo Cnty. Comm'n*,
    731 F.2d 1546 (11th Cir.), cert. denied, 469 U.S. 976 (1984) .............. 29, 52

*Upham* v. *Seamon*, 456 U.S. 37 (1982) (per curiam) ........................................ 60-61

*Veasey* v. *Perry*, 29 F. Supp. 3d 896 (S.D. Tex. 2014) ..........................................52

*Vecinos De Barrio Uno* v. *City of Holyoke*, 72 F.3d 973 (1st Cir. 1995) ..............38

**CASES (continued):**                                                    **PAGE**

*Village of Arlington Heights* v. *Metropolitan Hous. Dev. Corp.*,
    429 U.S. 252 (1977)..............................................................9, 13, 19

*Washington* v. *Davis*, 426 U.S. 229 (1976) ...........................................13

*Wise* v. *Lipscomb*, 437 U.S. 535 (1978) ................................................61

*Zimmer* v. *McKeithen*, 485 F.2d 1297 (5th Cir. 1973) ............................19

**STATUTES:**

Voting Rights Act (VRA) of 1965, 52 U.S.C. 10301 *et seq.*,
    52 U.S.C. 10301.........................................................1-2, 47
    52 U.S.C. 10301(a) ...................................................2, 36, 49
    52 U.S.C. 10301(b) ...........................................32, 37, 39, 58
    52 U.S.C. 10302.................................................................11
    52 U.S.C. 10302(a) ...........................................................11
    52 U.S.C. 10302(c) ...........................................................11
    52 U.S.C. 10308(d) ...........................................................39
    52 U.S.C. 10308(f).............................................................1

28 U.S.C. 1291 ...............................................................................1

28 U.S.C. 1331 ...............................................................................1

28 U.S.C. 1345 ...............................................................................1

N.C. Gen. Stat. § 163-54 (2014) ........................................................5

N.C. Gen. Stat. § 163-82.6(c) (2014) .................................................5

N.C. Gen. Stat. § 163-166.13(c)(2) (2015) .........................................8

N.C. Gen. Stat. § 163-166.15 (2015) .................................................8

N.C. Gen. Stat. § 163-227.2(b) (2014) ...............................................6

**STATUTES (continued):**                                                **PAGE**

2001 N.C. Sess. Laws 319, § 5(a)
(codified at N.C. Gen. Stat. § 163-227.2(b) (2002)) .................................... 5-6

2005 N.C. Sess. Laws 2, § 2
(codified at N.C. Gen. Stat. § 163-55(a) (2006)) ...........................................6

2007 N.C. Sess. Laws 253, § 1
(codified at N.C. Gen. Stat. § 163-82.6A(a) (2008))......................................5

**LEGISLATIVE HISTORY:**

S. Rep. No. 417, 97th Cong., 2d Sess. (1982) ......................................... 2, 33-34, 38

**RULES:**

Fed. R. Evid. 702(a) ..................................................................................31

Fed. R. Evid. 704 ......................................................................................31

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
————————————

Nos. 16-1468(L), 16-1469, 16-1474, & 16-1529

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

THE STATE OF NORTH CAROLINA, *et al.*,

Defendants-Appellees

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
————————————

BRIEF FOR THE UNITED STATES AS APPELLANT
————————————

## STATEMENT OF JURISDICTION

These cases involve challenges to North Carolina House Bill 589 (HB 589) under Section 2 of the Voting Rights Act (VRA), 52 U.S.C. 10301, and the United States Constitution. The district court exercised jurisdiction under 28 U.S.C. 1331, 1345, and 52 U.S.C. 10308(f). The court entered judgment for defendants on April 25, 2016. J.A. 24964-24966. The United States timely appealed on May 6, 2016; the other plaintiffs appealed on April 26, 2016. J.A. 24980-24981; J.A. 24967-24979. This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

1.  Whether the challenged provisions of HB 589 were adopted in part for a racially discriminatory purpose in violation of Section 2 of the VRA.

2.  Whether three provisions of HB 589—the abolition of same-day registration, cutbacks in early voting, and the prohibition on counting out-of-precinct provisional ballots—violate the results test of Section 2 of the VRA.

## STATEMENT OF THE CASE

1.  Section 2 imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby Cnty.* v. *Holder*, 133 S. Ct. 2612, 2631 (2013). It prohibits any "prerequisite to voting" or "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. 10301(a). In 1982, Congress amended Section 2 to make clear that a violation can be established by showing a discriminatory purpose, a discriminatory result, or both. See *Thornburg* v. *Gingles*, 478 U.S. 30, 34-37, 43-45 & nn.8-9 (1986); 52 U.S.C. 10301; S. Rep. No. 417, 97th Cong., 2d Sess. 27 (1982) (Senate Report).

2.  In 2013, the North Carolina General Assembly enacted an omnibus elections bill—House Bill 589 (HB 589)—that curtailed opportunities for citizens to register, vote, and have their ballot counted. HB 589 "represents the first major constriction of access to the polls in North Carolina since the passage of the 1965

Voting Rights Act." J.A. 791. The bill was passed following significant increases in voter registration and turnout by African Americans, and one month after *Shelby County* left those African-American voters newly vulnerable.

From 2000 to 2012, voter registration in North Carolina soared, increasing by 28.2% overall. J.A. 804. African-American citizens played an outsized role in that growth. The number of registered African-American voters increased by 51.1% (compared to a 15.8% gain for whites). J.A. 804. In 2008, the percentage of African Americans who were registered to vote surpassed the percentage of whites. J.A. 807. Turnout increases followed. J.A. 1196. North Carolina moved from 37th in overall presidential-year turnout among all states in 2000 to 11th in 2012. J.A. 692. And in both the 2008 and 2012 presidential elections, African-American voters made history by turning out at rates higher than whites. J.A. 1193-1197, 1268-1269; see also J.A. 952.

As introduced in and passed by the North Carolina House of Representatives, HB 589 was a short bill focused primarily on adopting a photo-ID requirement for voting. J.A. 2101-2112. Following House passage on April 24, 2013, the Senate stalled. J.A. 1290-1291. Then, on June 25, 2013, the Supreme Court issued its decision in *Shelby County*, releasing North Carolina from the requirements of Section 5 of the VRA. That same day, Senator Tom Apodaca

announced that the Senate would move ahead with the "full bill" version of HB 589.  J.A. 1290-1291; J.A. 1831-1832.

The post-*Shelby County* version of HB 589 undercut three key provisions of North Carolina law:  a 17-day early voting period; same-day registration (SDR) during early voting; and the counting of out-of-precinct (OOP) ballots for all offices for which the voter was entitled to vote.  J.A. 2119-2185.  It cut the early voting period by a week and eliminated SDR and the counting of out-of-precinct ballots altogether.  And it imposed a restrictive voter-ID regime that eliminated several forms of acceptable ID from the House-passed version, including public university IDs, employee IDs, and public assistance IDs.  Over the objection of senators who decried the bill as voter suppression, J.A. 6117-6119, 6185-6186, 6234-6245, the Senate passed HB 589 on July 25, 2013, on a party-line vote, with every African-American senator voting against it.  J.A. 2371, 2503, 2653-2654.  Two hours later, and one day before the legislature adjourned its 2013 session, the House took up the omnibus bill.  J.A. 2506.  Debate in opposition was capped, no conference committee was appointed, and there was no opportunity to offer amendments.  J.A. 167-168, 309, 329, 404-405; J.A. 2367, 2507-2511, 2650-2652.  Every African-American representative, and every member of the Democratic Caucus who was present—including legislators who had supported the prior version—spoke out against the omnibus bill.  J.A. 308-309, 329, 341, 348, 404;

J.A. 2555-2562, 2531-2539, 2561. Only one supporter rose to defend the legislation. J.A. 2620-2624. HB 589 was given less than three hours' consideration before the House—strictly along party lines—voted to concur. J.A. 2372, 2655; see also J.A. 1277-1305.

3. HB 589 was signed into law on August 12, 2013. That day, two sets of private plaintiffs filed challenges to the law alleging violations of the Constitution and the VRA. In September 2013, the United States filed its complaint under Section 2 of the VRA. A group of young voters later intervened, alleging constitutional violations. J.A. 15859; J.A. 16339-16399, 16569-16596. The United States asserted that the following provisions of HB 589, individually and cumulatively, violate Section 2's results test:

*Same-Day Registration.* Beginning in 2007, North Carolina allowed a prospective voter to register at an early voting site during the early voting period and cast a retrievable absentee ballot that same day. 2007 N.C. Sess. Laws 253, § 1 (codified at N.C. Gen. Stat. § 163-82.6A(a) (2008)); J.A. 2645. HB 589 eliminated SDR. J.A. 2317. Now, with a limited exception, aspiring voters cannot vote in an upcoming election unless they have registered at least 25 days before the election. N.C. Gen. Stat. §§ 163-54, 163-82.6(c) (2014).

*Early Voting.* North Carolina's prior early voting regime extended over 17 days, including two Sundays. 2001 N.C. Sess. Laws 319, § 5(a) (codified at N.C.

Gen. Stat. § 163-227.2(b) (2002)).  HB 589 eliminates a full week of early voting,

including one Sunday.  See N.C. Gen. Stat. § 163-227.2(b) (2014).

*Out-of-Precinct Provisional Voting*.  Before HB 589, a voter could cast a

provisional ballot at any precinct in the county where the voter was registered, and

the votes cast were counted for all contests in which the voter would have been

eligible to vote had he or she cast a regular ballot at his or her home precinct.  2005

N.C. Sess. Laws 2, § 2 (codified at N.C. Gen. Stat. § 163-55(a) (2006)); J.A. 2636-

2637.  HB 589 repealed that provision.  J.A. 2335-2336.  Now, provisional ballots

will not be counted if they are cast outside the voter's assigned precinct.  J.A.

2335.

*Photo Voter-ID Requirement*.  Prior to the enactment of HB 589, there was

no state-law requirement for registered voters in North Carolina to present

identification in order to vote.  Beginning in 2016 and with limited exceptions, HB

589 required in-person voters to present one of only seven forms of government-

issued IDs to vote.  The law did not provide an exception to this requirement for

voters who face barriers to obtaining qualifying IDs due to poverty, lack of

transportation, or other reasons.  J.A. 2291-2295.

The United States also argued that passage of HB 589 was motivated in part

by a racially discriminatory intent, in violation of Section 2.  J.A. 22649-22654.

On May 19, 2014, plaintiffs moved for a preliminary injunction to enjoin the challenged provisions of HB 589. J.A. 17961. The district court denied the motions. *North Carolina State Conference of the NAACP* v. *McCrory*, 997 F. Supp. 2d 322 (M.D.N.C. 2014). On appeal, this Court found "numerous grave errors of law" in the district court's analysis. *League of Women Voters of N.C.* v. *North Carolina*, 769 F.3d 224, 241 (4th Cir. 2014) (*LWV*), cert. denied, 135 S. Ct. 1735 (2015). On the record before the Court, the panel majority concluded that HB 589's elimination of SDR and out-of-precinct voting "looks precisely like [a] textbook example of Section 2 vote denial." *Id.* at 246. The Court remanded the case with instructions to the district court to reinstitute SDR and OOP voting under North Carolina's pre-HB 589 law. *Id.* at 248-249. The day after the district court entered the preliminary injunction, the Supreme Court, over a dissent, recalled and stayed the mandate and the injunction, pending disposition of defendants' petition for a writ of certiorari. *North Carolina* v. *League of Women Voters of N.C.*, 135 S. Ct. 6 (2014). After the Supreme Court denied defendants' petition, this Court issued its mandate, and the injunction reinstituting SDR and OOP voting went back into effect. J.A. 18203-18207.

While the preliminary injunction had been stayed, North Carolina held its 2014 midterm general and primary elections. During those elections, HB 589's cutbacks of early voting, and its ban on SDR and OOP voting, were all in place.

Trial on the merits was scheduled for July 2015. On June 18, 2015, the North Carolina General Assembly passed House Bill 836, which modified HB 589's photo-ID requirements. See N.C. Gen. Stat. §§ 163-166.13(c)(2), 163-166.15 (2015); J.A. 10019-10030. This modification allowed in-person voters without an acceptable photo ID to cast a provisional ballot, so long as they completed a declaration explaining that they have a reasonable impediment to obtaining a qualifying photo ID. The July 2015 trial addressed all claims except those challenging the voter-ID provision.

In January 2016, the district court held trial on plaintiffs' voter ID claims. The United States pressed a Section 2 intent claim as to the voter-ID requirement as enacted in 2013. The United States has not maintained a Section 2 results challenge to the voter-ID provision as amended in 2015.

The district court entered final judgment against plaintiffs on April 25, 2016. J.A. 24479-24966. Under that judgment, the injunction requiring North Carolina to continue offering same-day registration and counting out-of-precinct ballots will be lifted on June 8, 2016. J.A. 24966.

## STANDARD OF REVIEW

This Court "review[s] the district court's factual findings for clear error and its legal conclusions de novo." *Federal Trade Comm'n* v. *Ross*, 743 F.3d 886, 894 (4th Cir.), cert. denied, 135 S. Ct. 92 (2014). Clear error results "when, although

there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States* v. *Harvey*, 532 F.3d 326, 336 (4th Cir. 2008) (citations and internal quotation marks omitted).

## SUMMARY OF THE ARGUMENT

After remand, the district court committed several errors of law—including errors that this Court had already corrected in the initial appeal—that warrant reversal of its judgment dismissing the United States' claims. Although the district court *acknowledged* the proper legal framework for the discriminatory result and intent claims, it *applied* the wrong analysis, which infected its assessment of the evidence and its factual findings.

For the discriminatory purpose claim, the district court recognized that *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), provides the proper framework, but it made several legal errors in analyzing this claim. First, the court erred by failing to address the United States' argument that HB 589 was adopted, in part, with a race-based purpose to preserve partisan political control, in reaction to the surge in voter participation by African Americans. Second, the district court erred by engaging in a "rational basis"-type review of *possible* motivations, instead of analyzing *actual* motive, as required by

*Arlington Heights*.  Finally, the district court erred by improperly disregarding or entirely ignoring broad categories of probative intent evidence.

In analyzing the Section 2 results claim, the district court recognized that the statute requires a totality of the circumstances review, but committed legal error by repeatedly elevating the importance of one kind of evidence—aggregate minority turnout—above all other factors.  The district court then compounded that legal error in two ways.  First, the court looked to turnout evidence from midterm elections, rather than presidential elections, which feature an electorate more likely to be burdened by HB 589's restrictions.  Where the electorate itself is different, including for reasons relating to the socioeconomic effects of a history of discrimination, Section 2 requires courts to account for those differences.  Second, the overemphasis on turnout was particularly prejudicial to plaintiffs because the court mischaracterized testimony about HB 589's likely impact on aggregate turnout.

The court also made several other reversible errors in assessing the Section 2 results claim.  For example, the court disregarded this Court's prior instructions by again understating the burdens that HB 589 imposes and by applying a heightened causation standard that is not required under Section 2.

This Court's review of both the discriminatory intent and discriminatory results claims is necessary to address the full panoply of relief requested.[1]  The United States seeks relief under Section 3 of the VRA, 52 U.S.C. 10302, which depends on a finding of a discriminatory purpose.[2]  Because the district court's multiple legal errors infected its assessment of the United States' Section 2 claims, this Court should reverse the judgment below.

## ARGUMENT

## I

## THE DISTRICT COURT COMMITTED SEVERAL ERRORS OF LAW IN ANALYZING WHETHER HB 589 WAS ENACTED WITH DISCRIMINATORY INTENT

The district court improperly analyzed whether HB 589 was enacted for a discriminatory purpose.  The central premise of the United States' discriminatory intent claim is that when African Americans began showing signs of political success after a long history of having their vote circumscribed, the legislative

---

[1]  Reaching both grounds for a Section 2 violation also conserves judicial resources and avoids piecemeal review, especially where a petition for a writ of certiorari is probable in any event.

[2]  The United States requested relief under Section 3(c), 52 U.S.C. 10302(c), which authorizes courts to impose a preclearance requirement, and Section 3(a), 52 U.S.C. 10302(a), which permits the appointment of Federal observers in elections as part of a final judgment, if a discriminatory purpose is found, or an interlocutory order.  J.A. 22654, 22657; see also J.A. 22285.

found that their continued control of the legislature was at risk. The legislature responded after *Shelby County* by enacting HB 589 to restrict or eliminate voting methods used disproportionately by African Americans, and did so precisely *because* race is an especially powerful predictor of voting preference in North Carolina—indeed, it better predicts a voter's likely vote than does party registration. In other words, this claim was not about a legislature's efforts to change voting laws in the abstract, but about its efforts to change the racial composition of the electorate to maintain political power. In failing to confront this evidence connecting politics and race, the district court omitted a critical component of the discriminatory intent analysis. This was error.

The district court also erred as a matter of law by engaging in a "rational basis"-type review of *possible* motivations, instead of analyzing the *actual* justifications, or absence thereof, that the legislature proffered in enacting the challenged provisions of HB 589. Although the district court correctly acknowledged that the Supreme Court's decision in *Arlington Heights* provides the proper framework, it failed to focus on the ultimate question in the *Arlington Heights* analysis—whether a discriminatory purpose was one of the legislature's *actual* motives in enacting HB 589. Rather, the court improperly focused throughout its analysis on a different question—the possible, rational motivations that the legislature *could* have had in adopting HB 589. Finally, the district court

erred by improperly disregarding or entirely ignoring broad categories of significant intent evidence, including "fail[ing] to adequately consider North Carolina's history of voting discrimination," despite this Court's express guidance in the initial appeal. *LWV*, 769 F.3d at 242.

A.   *By Failing To Consider The Legislature's Actions In The Context Of "A Troubling Blend Of Politics And Race," The District Court Erred By Omitting A Critical Component Of The Discriminatory Intent Analysis*

To establish a violation of Section 2 based on a racially discriminatory purpose, plaintiffs must show that such purpose was a "motivating factor" in enacting the challenged law. *Arlington Heights*, 429 U.S. at 264-266. Plaintiffs, however, need not show that such a purpose was the "sole[]" or even "primary" motive. *Id.* at 265. Determining whether discriminatory intent exists "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. In this sensitive inquiry, discriminatory purpose "may often be inferred from the totality of the relevant facts, including" if "the law bears more heavily on one race than another." *Rogers* v. *Lodge*, 458 U.S. 613, 618 (1982) (quoting *Washington* v. *Davis*, 426 U.S. 229, 242 (1976)). If a race-based purpose is shown to be a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter* v. *Underwood*, 471 U.S. 222, 228 (1985).

1.  The legislative actions at issue must be analyzed against a backdrop of the high levels of racially polarized voting in a State with many highly competitive elections.  First, defendants admitted that racially polarized voting has existed and continues to exist in the State, see J.A. 8247; J.A. 21400; see also J.A. 3489, 3622.  As a defense expert conceded, "in North Carolina, African-American race is a better predictor for voting Democratic than party registration."  J.A. 21400.  Experts also testified that "[p]arty and race had become cemented to the foundation of North Carolina politics," J.A. 1270, and that "race is the most important demographic correlate of Democratic voting," J.A. 19860.  Second, the implication of such a correlation is that relatively small racial shifts in voting turnout can significantly affect elections, and ultimately legislative control.  See J.A. 19860.

It was this fact of North Carolina politics, particularly in presidential election years, that explained and provided context for the race-based motivations of the legislature in adopting HB 589.  The district court, however, failed to address the central premise of the discriminatory intent claim:  when African Americans began showing signs of political success after a long history of voting suppression, the legislative majority felt that its continued control over the legislature was threatened precisely because of this correlation between race and politics.

Specifically, the case presented to the district court was that the legislature was reacting to this political threat when it enacted HB 589 to target voting methods used disproportionately by newly empowered African Americans. See J.A. 22649-22653; J.A. 2270-2272. The evidence showed that African Americans had accounted for much of the soaring growth in voter registration from 2000 to 2012. J.A. 804. This growth paved the way for historic turnouts in 2008 and 2012, when African Americans voted at higher rates than whites for the first time in modern North Carolina history. And in 2008, the first year that the State allowed a combination of SDR, early voting, and OOP voting—without strict photo-ID requirements—President Obama became the first Democratic presidential candidate to win North Carolina since 1976. J.A. 1196, 1252-1253, 1267-1268. It was also in 2008 that a Democratic gubernatorial candidate won a narrow victory. J.A. 1211.

The United States argued that the legislative majority acted with this context in mind soon after *Shelby County* released the State from the oversight of the preclearance process. The majority sought to preserve its political control by adopting HB 589 to restrict or eliminate voting methods used disproportionately by newly powerful African-American voters. And as the district court found, African Americans disproportionately relied on same-day registration, OOP voting, and early voting, and they would be disproportionately injured by HB 589's ID

provision.[3]  This evidence, the United States argued, showed that the legislature acted "at least in part 'because of,' not merely 'in spite of,'" a law's "adverse effects upon an identifiable group."  *Personnel Adm'r of Mass.* v. *Feeney*, 442 U.S. 256, 279 (1979).

2.  The district court's wholesale failure to address this central claim constitutes legal error.  Although in reviewing the Section 2 *results* claim, the district court found "that polarized voting between African Americans and whites remains in North Carolina," the court's *intent* analysis never addressed the significance of this evidence.  J.A. 24720; cf. *Reno* v. *Bossier Parish Sch. Bd.*, 520 U.S. 471, 486, 490 (1997) (vacating the district court's "intent to retrogress" determination under Section 5 of the VRA "[b]ecause we are not satisfied that the District Court considered" certain relevant evidence).  Instead, the court emphasized only the partisan nature of the legislature's actions as if to suggest that politics alone explains the adoption of HB 589.  See, *e.g.*, J.A. 24515, 24518, 24793.

---

[3]  See J.A. 24657 (OOP voting); J.A. 24614-24615 (early voting); J.A. 24647 (SDR); J.A. 21084-21085 (noting African-American Democrats were twice as likely to use SDR as white Democrats in 2008); see also *LWV*, 769 F.3d at 233 ("Plaintiffs' expert presented unrebutted testimony that African American North Carolinians have used same-day registration at a higher rate than whites in the three federal elections during which it was offered.").

But where race and politics are so strongly correlated, it was legal error for the district court to treat racially discriminatory purposes and partisan goals as if they were somehow mutually exclusive. To properly consider whether race was used to achieve partisan goals, the district court should have applied the Supreme Court's guidance in *League of United Latin Am. Citizens* v. *Perry*, 548 U.S. 399 (2006) (*LULAC*), which analyzed the Texas legislature's electoral changes against a similar backdrop of "a troubling blend of race and politics." *Id.* at 442. In *LULAC*, the Supreme Court determined that Texas had violated Section 2 of the VRA based on evidence of voting changes that diluted the voting power of Latino voters who threatened the incumbency of a Representative in the majority party. See *id.* at 423-425, 438-440. Significant to the Supreme Court's analysis was the backdrop of the "troubling blend of politics and race," which explained that the legislature redrew a district to divide a cohesive Latino community "[i]n response to [its] growing [voting] participation that threatened [a Representative's] incumbency." *Id.* at 439, 442. The Supreme Court determined that the legislature's actions "undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive." *Id.* at 439. Based on this evidence, which provided important context for the legislature's actions, the Supreme Court concluded that "[i]n essence the State took away the Latinos' opportunity because

Latinos were about to exercise it. This bears the mark of intentional discrimination that could give rise to an equal protection violation." *Id.* at 440.

By contrast, the district court's discriminatory intent analysis here failed to discuss the use of racial means to achieve partisan ends in adopting HB 589, even though the evidence of the "troubling blend" in this case was every bit as strong as the evidence in *LULAC*. As in *LULAC*, the evidence here showed that the legislature was acting against a backdrop of starkly polarized voting, a history of discrimination against a minority group, and a recent surge in voter participation by that minority group that threatened the majority party. See J.A. 1184-1195, 1249-1251, 1266-1275; J.A. 3619-3625. The district court erred in ignoring this context and failing to consider whether the North Carolina legislature had adopted HB 589 to "[take] away [African Americans'] opportunity because [they] were about to exercise it." *LULAC*, 548 U.S. at 440.

Instead, the district court incorrectly focused on extraneous questions, such as whether passage of HB 589 involved "racial animus." The district court mischaracterized plaintiffs' theory as resting on the assertion "that HB 589's proponents' statements on the floor are pretextual for racial animus." J.A. 24892. It then proceeded to find an absence of such animus. J.A. 24892-24893. But, as a matter of law, plaintiffs were not required to provide proof of racial animus to show discriminatory purpose. See, *e.g.*, *Garza* v. *County of L.A.*, 918 F.2d 763,

778 & n.1 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part) (explaining how intentional discrimination can exist without racial animus, particularly in the context of incumbency protection efforts), cert. denied, 498 U.S. 1028 (1991). Consistent with its arguments, the United States showed that the legislature enacted HB 589 in part "because of," not "in spite of," its impact on newly empowered African-American voters, and the district court erred in failing to address these arguments that race was used to maintain political control.

B.   *The District Court Erred By Engaging In A "Rational Basis"-Type Review Of Possible Motivations, Instead Of Reviewing The Actual Justifications, Or Absence Thereof, Proffered By The Legislature*

In *Arlington Heights*, the Supreme Court identified several factors relevant to determining whether a law has a discriminatory purpose based on the actual motivations of the legislative body that enacted the law. See 429 U.S. at 265-268 (discussing a nonexhaustive list of five factors). The Supreme Court has also recognized that the Senate Factors, see p. 33, *infra*, may support a finding of a discriminatory purpose. See *Lodge*, 458 U.S. at 620-621 (affirming use of these factors as outlined in *Zimmer* v. *McKeithen*, 485 F.2d 1297 (5th Cir. 1973), to find discriminatory purpose); see also *United States* v. *Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (acknowledging that the Senate Factors "supply a source of circumstantial evidence regarding discriminatory intent").

The ultimate question, however, is whether the evidence as a whole shows that, more likely than not, one of the factors actually motivating the adoption of a law was a racially discriminatory purpose. In other words, the heart of the discriminatory intent inquiry seeks to discern the *actual* motivations in passing a law. It does not ask whether there are possible justifications for the law. Thus, a district court errs when it advances hypothetical justifications for a challenged law; the only relevant motives are those held by the officials who enacted or maintained the law.

While a discriminatory purpose implies more than "intent as awareness of consequences," it is enough to show that the legislature acted "at least in part 'because of,' not merely 'in spite of,'" a law's "adverse effects upon an identifiable group," regardless of whether politics or another goal drove that intent. *Feeney*, 442 U.S. at 279. Once a discriminatory purpose is shown to be a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228.

1. Although the district court recognized that *Arlington Heights* provides the proper framework for analyzing discriminatory intent, throughout its intent analysis, the court improperly focused on the legislature's *possible*, instead of *actual*, motivations. Rather than limiting its intent analysis to the direct and circumstantial evidence in the record, the court relied on unsubstantiated

conjectures about possible justifications for enacting HB 589. Indeed, some of these post-hoc rationales were neither asserted by legislators nor advanced by defendants during litigation. The district court committed legal error by proposing its own hypothetical justifications.

For instance, to reject plaintiffs' argument that the legislature's sweeping transformation of HB 589 immediately after *Shelby County* revealed a racially discriminatory intent, the district court relied on unsupported conjectures of what factors *could* have motivated the legislature, instead of determining what *did* motivate the legislature in suddenly producing the "full bill." The court's intent analysis was improperly based on its own judgment that "the administrative and financial cost" of seeking preclearance or the differences in the "burden of proof" under Section 5 and Section 2 could have motivated the legislature to transform HB 589 as it did. J.A. 24886. The court's conclusion that "[i]t *would not have been unreasonable* for the North Carolina Senate" to have such motivations, however, is irrelevant to whether the legislature in fact *had* such motivations. J.A. 24885-24886 (emphasis added). The court cited to no evidence showing that any legislator waited to add the challenged voting provisions to HB 589 because of the "administrative and financial cost" of preclearance. Nor did defendants make such an assertion in their post-trial filings.

Under those circumstances, the district court's finding that the United States had failed to prove a discriminatory purpose was infected by legal error. These possible motives proffered by the district court appear to be no more supported by the record than the legislature's proffered goals of electoral integrity and fraud prevention that this Court suggested were nothing "other than merely imaginable." *LWV*, 769 F.3d at 246.

The district court also erroneously focused on potential justifications for adopting HB 589's voter-ID provisions generally, rather than on the legislature's actual reasons for changing its voter-ID requirements to strictly limit the acceptable forms of IDs, and more important, for waiting until after *Shelby County* to do so. The post-*Shelby County* version of HB 589 harshly restricted acceptable voter IDs to only seven types and excluded certain forms of ID previously deemed acceptable, including public assistance IDs, college IDs, and government employee IDs. Compare J.A. 2115, with J.A. 2292. But the district court failed to address why the legislature had cut back the voter-ID provision so severely after *Shelby County* even though the House had all of the information it purportedly relied on, following thorough deliberation, when it passed its pre-*Shelby County* version.

Instead, the district court conjectured that "[a] legislator *could* have" adopted HB 589 by crediting public hearing testimony asserting the benefits of voter-ID requirements and questioning the accuracy of a State Board of Elections' (SBOE)

analysis showing racial disparities in registered voters who could not be matched with DMV-issued IDs.[4]  J.A. 24874-24875 (emphasis added).  But here, too, the court's theoretical explanations for how the legislature *could* have acted "in spite of" this racially disparate impact, does not answer the relevant question of whether it in fact did.  Nor does it address the critical question of why legislators changed the voter-ID requirements, exacerbating the disparate impact, after *Shelby County*.

Focusing on possible justifications for adopting a law based on a "rational basis"-type review effectively prevents plaintiffs from ever satisfying their burden of proof of discriminatory purpose.  Not only does relying on seemingly endless post-hoc justifications for why a legislature *may* have passed a law conflict with the framework set forth in *Arlington Heights*, such an analysis is also inconsistent with the burden-shifting framework required in *Hunter*, 471 U.S. at 228.  Moreover, the district court's rational basis-type approach to justifying HB 589 misses the point.  The purpose of a discriminatory intent inquiry is to sift out the

---

[4]  In reaching this conclusion, the court failed to consider that several key legislative supporters of HB 589 were directly involved in developing the criteria for the SBOE's subsequent matching analysis in April 2013.  J.A. 5241; J.A. 22193-22194.  Indeed, one legislator's counsel involved in approving the final SBOE matching report, which showed racial disparities in registered voters unmatched with DMV-issued IDs, affirmed that the new analysis had "hit the nail on the head."  J.A. 4836.

legislature's *actual* intent, not to determine whether the law *could* have been passed for rational reasons.

2.  The significance of this error was compounded by other flaws in the intent analysis, such as ignoring instances when there was no explanation for an action the court found suspect and analyzing intent in the abstract untethered from the specific provisions of HB 589.  The district court, for example, recognized that the legislators' removal, post-*Shelby County*, of public assistance IDs as an acceptable type of voter ID was "suspect" because legislators "could have surmised that African Americans would be more likely to possess this form of ID." J.A. 24882.  But instead of determining whether the legislature had a non-discriminatory explanation for this "suspect" change, the court ignored the absence of any such reason and simply concluded that the ID changes "as a whole" were not "as suspect as" claimed.  J.A. 24882.

In failing to consider the actual explanations—discriminatory or otherwise—for the legislature's adoption of HB 589's voter-ID provisions, the district court also improperly focused its intent analysis on the benefits and burdens of voter ID laws generally.  The court relied on *Crawford* v. *Marion Cnty. Election Bd.*, 553 U.S. 181, 192-197 (2008) (plurality opinion), to suggest "that there are many legitimate (i.e., non-discriminatory) reasons for a legislature to enact an ID requirement." J.A. 24875-24876.  But the Supreme Court's affirmance of an

unrelated Indiana voter ID law against a facial constitutional challenge says

nothing about whether North Carolina's legislature acted with a racially

discriminatory purpose. See *Crawford*, 553 U.S. at 187, 204 (plurality opinion).

The question is not whether the legislature might have passed *some* voter ID law

without a discriminatory motive; it is why it passed *this* law, and whether it would

have done so absent a discriminatory purpose. And *this* law was significantly

more restrictive than almost every other state's photo-ID requirement that had been

enacted at that time. J.A. 2595-2596; J.A. 3501-3503; J.A. 4403-4405.

C.    *The District Court Erred By Improperly Disregarding Or Ignoring Broad*
      *Categories Of Significant Intent Evidence*

      1.    *The District Court Improperly Disregarded Evidence Showing That*
            *The Legislature Had Actively Sought Racial Data That Showed HB*
            *589's Disparate Racial Impacts And Then, With This Knowledge, Had*
            *Presented And Adopted The Bill*

Given the sensitive nature of a discriminatory intent analysis, it is critical to

evaluate evidence in context. The United States argued below that a

discriminatory purpose should be inferred from the historical and immediate

context in which the legislature held onto a voter ID bill until *Shelby County* was

decided, and then transformed it by loading the new omnibus bill with provisions

that disproportionately harmed African-American voters. Instead of analyzing

whether the evidence supported this argument, the district court assessed the

evidence in silos, divorced from the United States' theory of its claim. This

approach led the court to "examine the trees so minutely that [it] los[t] sight of the forest." *Merritt* v. *Old Dominion Freight Line, Inc.*, 601 F.3d 289, 302 (4th Cir. 2010) (Davis, J., concurring).

This approach was particularly problematic given that the challenged provisions of HB 589 interact with each other to depress African-American voter participation, as explained below. See note 7, *infra*; see also *LWV*, 769 F.3d at 242 ("By inspecting the different parts of House Bill 589 as if they existed in a vacuum, the district court failed to consider the sum of those parts and their cumulative effect on minority access to the ballot box."). That is, the problem was not just that district court reviewed the evidence piecemeal, but that the nature of this discriminatory intent claim required a forest-level view.

The district court individually analyzed and disregarded each piece of evidence showing that the legislature had proactively requested racial data showing HB 589's disparate racial impacts; in doing so, the court failed to consider the overarching context in which the legislature had requested or been presented with this data. The court, for example, assessed in the abstract the probative value of evidence that a legislative staffer and the House co-sponsors of HB 589 had specifically requested or received racial data on voter turnout, type of vote (early and election day), provisional ballots, one-stop voters, verification rates for SDR, and possession of certain types of IDs. J.A. 24864-24867. The court then

dismissed the probative value of this evidence, including because the requests were "not necessarily as suspect as Plaintiffs claim" and certain data was received after HB 589 had been drafted.[5] J.A. 24866-24867.

But the question is not whether the requests are "necessarily" suspect. For example, a different legislature might have made similar requests and then modified proposed legislation to avoid its impact on the minority community. What makes the requests probative of the legislature's discriminatory purpose here is that the information the legislature acquired increased its confidence that HB 589 would have its intended effect—to deter participation by African-American voters whose votes threatened the drafters' continued control of the legislature.

Because the district court's analysis was untethered from the context of plaintiffs' discriminatory intent claim, the court failed to consider how this evidence showed the salience of race in the North Carolina legislature and how this data related to the post-*Shelby County* transformation of HB 589. In deeming this evidence as less "suspect," the district court justified the requests for racial data as necessary for "[a]ny responsible legislator" to address possible challenges to HB

---

[5] The court also suggested that evidence of a legislative staffer's request for certain racial data had little probative value because the court did not have evidence of the underlying data, despite a voluminous record. J.A. 24865. The court, however, failed to consider that it had denied plaintiffs access to discovery of communications between legislators and their staff, which could have uncovered the information that the court deemed significant. J.A. 18194-18195.

589. J.A. 24866. The court, however, failed to consider that the version of the bill at that time did not include the challenged provisions on SDR, provisional voting, early voting, and other restrictive voting changes that related to the racial data requested. Thus, by analyzing the evidence in isolation, the court lost sight of the bigger picture—that soon after *Shelby County*, the legislature transformed and quickly passed HB 589, which cut back on voting practices for which it had previously requested racial data. See *LWV*, 769 F.3d at 242-243.

2.    *Despite This Court's Express Guidance In The Initial Appeal, The District Court Continued To Erroneously Downplay North Carolina's History Of Voting Discrimination*

In the initial appeal in this case, this Court determined that the district court erred as a matter of law by "fail[ing] to adequately consider North Carolina's history of voting discrimination." *LWV*, 769 F.3d at 242. This Court highlighted the district court's insufficient consideration of voting discrimination in North Carolina after 1965, and explained that "the post-*Shelby County* facts on the ground in North Carolina should have cautioned the district court against" celebrating the voting rights progress here. *Id.* at 243.

Despite this guidance, the district court once again failed to adequately consider the history of voting discrimination in North Carolina. This omission tainted the court's intent analysis because North Carolina's history of discrimination provided circumstantial support for the experts' theory that HB 589

was adopted in reaction to rising voter participation by African Americans, which threatened the majority's political control. See *McMillan* v. *Escambia Cnty.*, 748 F.2d 1037, 1044 (5th Cir. 1984) ("A history of pervasive purposeful discrimination may provide strong circumstantial evidence that the present-day acts of elected officials are motivated by the same purpose, or by a desire to perpetuate the effects of that discrimination." (quoting *United States* v. *Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir.), cert. denied, 469 U.S. 976 (1984))).

The district court largely discounted evidence of the State's history of voting discrimination and incorrectly concluded that "there is little evidence of official discrimination since the 1980s." J.A. 24883. This failed to take into account, however, this Court's insight regarding "the prophylactic success of Section 5's preclearance requirements" and the context in which the legislature rushed to enact HB 589. *LWV*, 769 F.3d at 239; see *id.* at 242 (observing that the legislature "rushed to pass House Bill 589" immediately after *Shelby County*, when "history" without the VRA "picked up where it left off in 1965").

The court, moreover, failed to adequately consider evidence that during this time period in which it asserted that there was little evidence of discrimination—*i.e.*, 1980 to 2013—the Department of Justice objected to more than 50 voting changes in North Carolina for failing to show that the proposed changes would have neither a discriminatory purpose nor a discriminatory effect. J.A. 1963,

1968-1975; J.A. 4096-4097.  Despite the probative value of this evidence, and

given the changes made to HB 589 immediately after *Shelby County*, the court

made only a cursory reference in its analysis to "various objection letters issued by

the DOJ when North Carolina was subject to § 5 pre-clearance."  J.A. 24721.  This

was error.

> 3. *The District Court Improperly Rejected Plaintiffs' Expert Testimony Regarding Discriminatory Intent*

The district court also improperly discounted evidence presented by expert

historians.  Courts in voting cases routinely consider expert testimony concerning

discriminatory intent and the history of voting discrimination.  See, *e.g.*, *Garza*,

918 F.2d at 767 n.1, 771; *Dillard* v. *Crenshaw Cnty.*, 640 F. Supp. 1347, 1356,

1358-1359 (M.D. Ala. 1986); *Bolden* v. *City of Mobile*, 542 F. Supp. 1050, 1075

(S.D. Ala. 1982).  The question of legislative purpose is complex, and opinions of

expert historians are particularly probative in voting cases where the legislature's

actions echo historical patterns of discrimination or react to past racially-charged

situations in that jurisdiction.  For example, here, expert testimony explained North

Carolina's historical pattern: backlash through the use of voting restrictions in

response to rising political participation by African Americans.  See J.A. 1255-

1256; J.A. 19196-19197; see also J.A. 802-803; J.A. 22142.  That historical pattern

sheds light on the motive behind HB 589.

The district court discounted this testimony because it ostensibly "constituted nothing more than [an] attempt to decide the ultimate issue for the court," J.A. 24876, but its treatment rests on a legally erroneous view of what expert historians do. Such experts do not substitute their judgment for the court's with respect to the ultimate factual conclusion regarding legislative purpose. But testimony like that offered here, by experts with extensive specialized knowledge of historical voting discrimination and experience analyzing legislative records and other records to discern a legislature's intent, illuminates the political context for the present legislative action, within North Carolina's particular lived history. See, *e.g.*, J.A. 1179, 1182-1183, 1247-1250; J.A. 3605. That is, these experts offered "specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). That an expert's opinion "embraces an ultimate issue" does not undermine its relevance or probative value. Fed. R. Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue."). It was error for the district court to reject this expert testimony by giving it little to no weight.

## II

## THE DISTRICT COURT FAILED TO PROPERLY APPLY THE SECTION 2 RESULTS TEST

A Section 2 results violation is proven when, "based on the totality of circumstances," members of a racial group "have less opportunity than other

members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. 10301(b). The "essence" of a results claim is that a challenged practice "interacts with social and historical conditions" attributable to race discrimination "to cause an inequality in the opportunities enjoyed by [minority] and white voters." *Gingles*, 478 U.S. at 47. Section 2 thus requires a "peculiarly" fact-based inquiry into the "design and impact of the contested electoral mechanism[]" in light of the jurisdiction's "past and present reality." *Id.* at 79 (citations and internal quotation marks omitted).

This Court has adopted a two-element framework for determining the existence of a Section 2 violation in vote denial and abridgement cases such as this one:

*First*, the challenged provision "must impose a discriminatory burden," meaning that it "disproportionately impact[s] minority voters." *LWV*, 769 F.3d at 240, 245. This first step incorporates both the likelihood that minority voters are affected and their relative ability to overcome the burdens the law imposes.

*Second*, the disproportionate impact "must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *LWV*, 769 F.3d at 240 (citation and internal quotation marks omitted). This second step requires the court to determine whether, based on "the totality of circumstances," the law works in concert with

conditions tied to race discrimination to produce a discriminatory result "on account of race or color." *LWV*, 769 F.3d at 240-241. The causal inquiry under Section 2 is not whether the challenged practice standing alone causes the disproportionate impact, but rather whether the practice "interacts with social and historical conditions" to produce "an inequality in the opportunities enjoyed by black and white voters." *Gingles*, 478 U.S. at 47; see also *Gonzalez* v. *Arizona*, 624 F.3d 1162, 1192 (9th Cir. 2010), aff'd, 133 S. Ct. 2247 (2013).

When assessing both elements, "courts should consider the totality of circumstances." *LWV*, 769 F.3d at 240 (citation and internal quotation marks omitted). To do so, courts rely on a nonexhaustive list of factors articulated in the Senate Report accompanying the 1982 VRA Amendments (Senate Factors). See *Gingles*, 478 U.S. at 44-45; Senate Report 28-29. No one factor is dispositive and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *LWV*, 769 F.3d at 245 (quoting *Gingles*, 478 U.S. at 45). "The need for such 'totality' review springs from the demonstrated ingenuity of state and local governments in hobbling minority voting power" as "jurisdictions have substantially moved from direct, over[t] impediments to the right to vote to more sophisticated devices" that nonetheless impair minority political power. *Johnson* v. *De Grandy*, 512 U.S. 997, 1018 (1994) (brackets in original; citations omitted).

The Senate Factors help courts analyze whether a challenged practice interacts with preexisting conditions to deny or abridge the right to vote "on account of race or color." *Gingles*, 478 U.S. at 36, 45 & n.10. The list includes the jurisdiction's history of official discrimination (Factor 1), the extent to which the socioeconomic effects of discrimination hinder access to the political process (Factor 5), and the tenuousness of the justification for the challenged practice (Factor 9). See *id.* at 36-37; Senate Report 28-29. Where plaintiffs challenge the repeal of voting procedures that minority voters have relied on, the state's "previous voting practices  *  *  * are a critical piece of the totality-of-the-circumstances analysis Section 2 requires." *LWV*, 769 F.3d at 242; see also *Ohio State Conference of the NAACP* v. *Husted*, 768 F.3d 524, 558 (6th Cir.), vacated, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014).

A.    *The District Court Gave Impermissible Weight To Evidence Regarding 2014 Turnout*

While the district court recognized that Section 2 requires a totality of the circumstances review, the court used one piece of evidence to frame its legal analysis. The court repeatedly gave impermissible weight to evidence regarding increased African-American turnout in the 2014 midterm elections as compared to the 2010 midterm elections. Thus, the court held that African-American 2014 turnout numbers "contradict the claim that [HB 589] has a negative, disparate impact on African Americans," J.A. 24618, and concluded that North Carolina's

2014 turnout data undermined the Section 2 results claim as to each practice challenged.

This was legal error because Section 2 requires judgments regarding "the ultimate conclusions about equality or inequality of opportunity" be grounded in a "comprehensive, not limited, canvassing of relevant facts." *De Grandy*, 512 U.S. at 1011. Prioritizing 2014 turnout over all other evidence contravenes this fundamental requirement.

The district court's legal error regarding the treatment of turnout evidence prevented the court from properly weighing the evidence as a whole. Aggregate turnout evidence may not be at all probative of whether a challenged practice imposes an unlawful burden on minority voters. Moreover, the court failed to recognize that where such evidence is limited to a single before- and after-implementation comparison of midterm election years, aggregate turnout data are of particularly limited value and cannot substitute for "carefully and searchingly review[ing] the totality of the circumstances." *De Grandy*, 512 U.S. at 1026 (O'Connor, J., concurring). Due to these legal errors, the court made the clearly erroneous factual findings that none of HB 589's challenged provisions have a discriminatory result.

*1.    The District Court Erred In Elevating The Importance Of A Single Aggregate Turnout Comparison Above All Other Evidence*

No court has ever required evidence of decreased aggregate minority turnout as a threshold requirement for Section 2 liability.  But in this case, the district court assigned greater weight to evidence of African-American turnout in the 2014 midterm elections than to all the other evidence presented regarding the burdens that African-American voters face under HB 589.  Indeed, the court held that "the trial evidence contradicted many of the factual premises  *  *  *  that underlay the Fourth Circuit's decision" as "the 2014 election data is now available and provides this court with evidence of how minorities <u>actually participate</u> under [HB 589]." J.A. 24702-24703.  The repeated emphasis on 2014 aggregate turnout as the singularly most probative evidence runs throughout the district court's analysis. See, *e.g.*, J.A. 24529, 24532, 24613, 24617-24619, 24627, 24630-24631, 24634, 24643-24645, 24659, 24678-24680, 24702-24705, 24709-24710, 24718, 24728, 24741, 24763, 24825, 24833, 24841, 24854, 24858-24860, 24954-24956.

To require or otherwise elevate the importance of decreased aggregate turnout ignores the plain language of Section 2, which forbids practices that "result[] in a denial *or abridgement* of the right  *  *  *  to vote on account of race or color."  52 U.S.C. 10301(a) (emphasis added).  By its terms, Section 2 requires plaintiffs to show only that, as a result of a challenged practice, minority voters have "less opportunity" to participate relative to other voters, not that they have *no*

opportunity. 52 U.S.C. 10301(b). Aggregate minority turnout can increase—as compared to a single prior election cycle—notwithstanding the imposition of voting restrictions that disparately and materially burden minority voters as compared to white voters. This is so because turnout in any particular election is driven by many different factors, including the offices on the ballot, the competitiveness of the election, total campaign spending, get-out-the-vote efforts, and overall voter interest. J.A. 19698-19699; J.A. 21114-21117. Indeed, these other factors typically have a greater effect on aggregate turnout than do changes in election laws. J.A. 19698-19699. Courts cannot gauge the impact of new voting requirements on turnout simply by comparing the first election in which a requirement is implemented with the prior election. For example, it would be impossible to draw a conclusion about how a hypothetical voter ID law implemented in 2006 impacted African-American voters solely by comparing 2004 presidential-year turnout with the historically high African-American turnout in 2008. It is likewise impossible to draw causal conclusions about the burdens imposed by HB 589 simply by comparing aggregate turnout in the 2010 and 2014 elections. J.A. 19401; J.A. 19634, 19897; J.A. 21114.

Given the many factors that can affect voter participation, it is unsurprising that courts of appeals have found that it is a blatant error of law to deny relief to Section 2 plaintiffs based solely on the results of one or two elections. See, *e.g.*,

*Ruiz* v. *City of Santa Maria*, 160 F.3d 543, 549-550 (9th Cir. 1998), cert. denied, 527 U.S. 1022 (1999); *Teague* v. *Attala Cnty.*, 92 F.3d 283, 288-289 (5th Cir. 1996), cert. denied, 522 U.S. 807 (1997).  In reviewing Section 2 claims, the Supreme Court, this Court, and other courts of appeals have repeatedly cautioned against placing too much emphasis on results from a single election cycle.  See *Gingles*, 478 U.S. at 41, 57; *Hines* v. *Mayor of Ahoskie*, 998 F.2d 1266, 1272 (4th Cir. 1993); *Collins* v. *City of Norfolk*, 883 F.2d 1232, 1242 (4th Cir. 1989), cert. denied, 498 U.S. 938 (1990); *Johnson* v. *Hamrick*, 296 F.3d 1065, 1074 (11th Cir. 2002); *Vecinos De Barrio Uno* v. *City of Holyoke*, 72 F.3d 973, 984-985 (1st Cir. 1995); *Baird* v. *Consolidated City of Indianapolis*, 976 F.2d 357, 359-360 (7th Cir. 1992), cert. denied, 508 U.S. 907 (1993).  While that caution has most often been raised in the context of vote dilution challenges addressing whether voting is racially polarized, it is fully relevant here.  Overemphasis on any one metric for measuring equal access to the political process is legal error because it is inconsistent with Section 2's totality of the circumstances framework.

To be sure, minority participation rates can be relevant to determining whether a law has a discriminatory result.  See, *e.g.*, Senate Report 29 & n.114.  In *Mississippi State Chapter, Operation PUSH, Inc.* v. *Mabus*, 932 F.2d 400 (5th Cir. 1991) (*Operation PUSH*), the effect of the challenged laws on registration rates was relevant because those laws had been in place since 1892 (dual voter

registration requirement) and 1955 (no satellite offices for registration). See *id.* at

402. But the VRA does not *require* plaintiffs to endure discriminatory practices

for multiple elections in order to prove an unlawful effect. Indeed, the VRA

permits the Attorney General to seek "preventive relief," including a permanent

injunction, where there are reasonable grounds to believe a practice will violate

Section 2. 52 U.S.C. 10308(d); see also *Shelby Cnty.*, 133 S. Ct. at 2619 (Section 2

can be used to "block voting laws from going into effect").

Moreover, depressed turnout cannot be assumed to flow from every Section

2 violation. Limiting Section 2 results violations to only those practices that

depress aggregate turnout ignores the clear statutory directive to consider the

"totality of the circumstances." 52 U.S.C. 10301(b). Under the results test, courts

analyze the comparative burden that a challenged practice imposes, and the

comparative effort that minority voters must take to overcome it. Otherwise, a

decision to hold voting hours from 7 a.m. to 7 p.m. in a majority white precinct,

but only from 9 a.m. until 12 p.m. in a majority black precinct, would be

immunized from challenge under Section 2's results test as long as black workers

were willing to give up their morning pay in order to vote. Instead, a Section 2

vote denial claim need only be predicated on showing that the challenged practice

has made it "more difficult" for African Americans than for whites to participate

electorally given the existing social and historical conditions. *Chisom* v. *Roemer*, 501 U.S. 380, 408 (1991) (Scalia, J., dissenting).

The district court attempted to find support for its contrary approach in other Section 2 cases where courts purportedly "rely on the electoral mechanism's effect on minority success in turnout and registration rates, or else find the failure to produce such evidence fatal." J.A. 24709. But the court misread those cases. For example, in *Smith* v. *Brunswick County*, 984 F.2d 1393 (4th Cir. 1993), this Court found no Section 2 violation because there was insufficient proof of racially polarized voting, not because African-American participation rates by themselves defeated liability. *Id.* at 1400-1402. The same is true for the denial of relief in *Salas* v. *Southwest Texas Junior College District*, 964 F.2d 1542, 1556 (5th Cir. 1992). In other cases cited by the district court, turnout evidence was important for deciding whether Senate Factor 5 weighed for or against plaintiffs—not for finding such evidence or lack thereof broadly "fatal" to a Section 2 claim. See, *e.g.*, *League of United Latin Am. Citizens, Council No. 4434* v. *Clements*, 999 F.2d 831, 866-867 (5th Cir. 1993) (en banc), cert. denied, 510 U.S. 1071 (1994); *Solomon* v. *Liberty Cnty.*, 957 F. Supp. 1522, 1563-1565 (N.D. Fla. 1997), aff'd, 221 F.3d 1218 (11th Cir. 2000).

The district court thus erred in giving the 2010 to 2014 aggregate turnout comparison outsized importance, especially when viewed in the context of the

record as a whole.  The 2010 to 2014 turnout comparison simply does not speak to

the plaintiffs' evidence showing that removal of OOP and SDR, and cutbacks in

early voting, burdened minority voters more severely.  J.A. 21810-21811; J.A.

22210-22215, 22217-22220, 22225-22230.

For example, that overall African-American turnout increased in one

election does not negate evidence that removing SDR disparately burdens African-

American voters because of persistent racial disparities in literacy and educational

attainment.  J.A. 22210-22212.[6]  Nor can it negate undisputed evidence showing

that in every federal general election from 2002 to 2014 except 2006—before,

during, and after the period from 2007 to 2013 when SDR was available—African

Americans were more likely than whites to register after the 25-day registration

deadline and disproportionately used SDR when it was available.  J.A. 819-820,

830-831, 964-965, 967; J.A. 4559-4560; J.A. 24647.[7]

---

[6]  Moreover, these burdens arise in the context of depressed minority turnout
generally.  While African-American turnout increased and white turnout decreased
as compared to 2010, African-American turnout rates still lagged behind white
turnout rates in 2014, as they had in the 2010 and 2006 midterm elections.  J.A.
8416.

[7]  The district court incorrectly states that plaintiffs' data from 2008 and
2012 only report how many North Carolinians registered during the early voting
period, not how many actually used SDR.  J.A. 24647 n.100.  Dr. Stewart
distinguished registrants who used SDR from individuals who used other
registration methods during that period and found that African Americans

(continued…)

2.    *The District Court Erred In Failing To Note The Limited Probative Value Of Midterm Election Turnout Data As Compared To Presidential Year Impact*

The overreliance on 2014 turnout evidence is legal error because the court failed to sufficiently consider that midterm-year voters are meaningfully different from voters participating in presidential election years.  J.A. 2787-2788.  Where the electorate itself is different, including for reasons relating to the socioeconomic effects of a history of discrimination, the proper Section 2 analysis requires the court to take account of those differences.  See J.A. 23801-23802 (defendants' expert conceding that midterm voters are more likely to be repeat voters and of higher socioeconomic status).

There is an uncontested "gulf in prior voting experience" in North Carolina between presidential- and midterm-year voters.  J.A. 4462.[8]  New and

---

(…continued)
disproportionately used SDR.  See J.A. 821-825.  The court further erred by failing to account for the combined and cumulative effect of cutbacks to early voting and the elimination of SDR.  *LWV*, 769 F.3d at 242.  The impact of SDR is dependent upon the length of the early voting period.  Most starkly, if there were no early voting period, the absence of SDR would make no difference.  Conversely, the impact of cutbacks to early voting lessens not just the opportunity to vote—but with SDR—the opportunity both to register and vote.

[8]  In 2014, 90.7% of midterm voters in North Carolina had voted in the 2012 presidential election and 64.6% had voted in the 2010 and 2012 general elections. For the 2012 presidential election, barely half (53.5%) had voted in the 2010 midterm and less than half (49.7%) had voted in the past two elections.  J.A. 4462.

inexperienced voters—the voters who are most likely to avail themselves of the voting mechanisms eliminated by HB 589—are far more likely to participate in presidential elections than in midterm elections. See J.A. 19620. The weight of the evidence consistently and repeatedly showed that the election changes at issue would have a significantly lesser effect in a midterm election as compared to a presidential general election. J.A. 812; J.A. 2787-2788; J.A. 4466, 4482, 4484-4486. In presidential elections, African-American turnout is far higher—in both proportional and absolute terms, J.A. 8416—and North Carolina's already higher-than-average early voting wait times will disproportionately burden African-American voters, who are more likely to work nonstandard and extended hours and lack access to vehicles and reliable transportation as compared to whites. J.A. 22151-22152, 22155-22156; 22219-22222. Moreover, in presidential election years, African-American voters were particularly and disproportionately likely to vote during the now eliminated first week of early voting. J.A. 834-835, 846-849. On the now-eliminated first Sunday of early voting, 49% of voters going to the polls in the 2008 general election were African American, as were 43% of such voters in 2012. J.A. 977; J.A. 19620; J.A. 22218.

In contrast, the minority voters who participate in midterm elections are better equipped to confront adverse elections rules and are sufficiently low in number so as to pose little threat to the enacting legislature. Not so for the newly

empowered minority voters who participated in record numbers in the 2008 and 2012 elections and who threatened to topple the majority party's hold on power. That burgeoning electorate was the primary perceived threat, and it includes minority voters more likely to be burdened and deterred by HB 589's restrictions. Thus, for example, racial disparities in early voting are largest in presidential elections. In the 2008 and 2012 general elections, more than 70% of African-American voters used early voting, as compared with 51% and 52% of white voters, respectively. J.A. 615-617; J.A. 4554. Similarly, midterm voters were less likely to avail themselves of SDR when it was available because they were likely already registered.[9] Midterm voters were also less likely to cast a provisional ballot because they had prior experience going to the polls to vote. J.A. 4461-4462, 4484-4486.

---

[9] Many more voters register during presidential election cycles (*e.g.*, 2010 to 2012—more than 1.1 million new registrations) than during midterm election cycles (*e.g.*, 2012 to 2014—approximately 640,000 new registrations), J.A. 8417, yet another reason why the district court's overreliance on data from a single midterm election was inappropriate. Dr. Stewart's testimony on "churn" in the voter rolls highlighted this pattern. J.A. 19611-19612; see also J.A. 8417. The district court misunderstood this testimony, see J.A. 24645 & n.98 (faulting Dr. Stewart for failing to compare voter registration during the 2010 and 2014 midterm election cycles), and as a result, wrongly discounted it.

3. *The District Court Compounded The Error Of Its Overemphasis On Turnout By Misstating Relevant Testimony On The Subject*

Finally, the prejudice to plaintiffs caused by the district court's legal error in overemphasizing 2014 turnout was compounded by the court's clear factual errors in recounting expert testimony on this subject. The court repeatedly stated that plaintiffs' experts made "inaccurate predictions" about the likely effects of HB 589 on minority turnout and stated that the 2014 "turnout numbers are contrary to Plaintiffs' experts' predictions." J.A. 24618; see also J.A. 24617-24618.

The district court further faulted plaintiffs' experts for not conducting an analysis of the 2014 elections that purported to isolate HB 589's effects on turnout. *E.g.*, J.A. 24656-24657. But these findings cannot be squared with the testimony that the court heard.

First, contrary to the district court's statements, during the preliminary injunction hearing, Dr. Stewart did not predict that African-American turnout in 2014 would be lower than aggregate African-American turnout in 2010. Dr. Stewart did not predict a drop-off in aggregate 2014 turnout at all. Instead, he told the court that he "could not give an opinion" on any possible reduction in African-American turnout, testified that many factors would affect turnout, including the "hot senate race at the top of the ballot," and stated that "most political scientists" and "most observers who are not political scientists[] are estimating that turnout in 2014 is going to be higher than in 2010." J.A. 17596-17597. He thus testified that

HB 589's restrictions would disparately burden African-American voters even as he recognized that 2014 aggregate turnout could increase. On cross-examination, he re-emphasized that he was not making any predictions on whether African-American turnout would decrease specifically in 2014 and explained that such predictions for a single election year "require[] a multi-vari[ate] statistical analysis" that "would be outside I think the data and the analysis that's possible at this point." J.A. 17547-17548.

Second, at trial, Dr. Stewart explained that there was insufficient data to reliably measure the turnout effects of HB 589 in the 2014 election. Isolating the effects of the law on turnout would "need a lot of observations" either from "a lot of years or a lot of people or a lot of geographic units" from more than one state. J.A. 19637. He reaffirmed that drawing conclusions based on 2014 alone was beyond the scope of what the data allowed. J.A. 19636-19637.

Discounting expert testimony based on an incorrect statement of what the experts actually said is clear error. Because the district court was wrongly fixated on assessing the impact of HB 589 solely through one year of turnout, and compounded that error by misstating what Dr. Stewart testified to on that subject, the court failed to take proper account of persuasive testimony by Dr. Stewart and other plaintiffs' experts about the disparate burdens that HB 589 imposes on minority voters.

B.     *The District Court Misapplied This Court's Instructions For Determining What Constitutes A "Discriminatory Burden" Under Section 2*

The district court disregarded this Court's previous instructions for addressing the first element of the test for Section 2 vote denial and abridgment claims. That element asks whether the challenged restrictions "impose a discriminatory burden on members of a protected class, meaning that members of the protected class 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *LWV*, 769 F.3d at 240 (quoting *Husted*, 768 F.3d at 55); see also 52 U.S.C. 10301.

1.     *The District Court Improperly Discounted Evidence Of Burden Based On The Number Of Voters Affected*

The district court again erred when it "minimized Plaintiffs' claim as to out-of-precinct voting" based on the number of voters affected. *LWV*, 769 F.3d at 244. The district court acknowledged this Court's corrective instruction but then repeated the same error. Specifically, the district court relied on the relatively low number of out-of-precinct voters to hold that "OOP voting was not significant to the parity in political participation achieved by African Americans since 2008" given that "not having OOP would only have changed the turnout differential [between African Americans and whites] by .1% in 2008[,] .2% in 2010, and less than .1% in 2012." J.A. 24842-24843. In rejecting plaintiffs' claim, the court

concluded that "the number of voters affected is some evidence of the magnitude of the burden imposed." J.A. 24843.

Contrary to the district court's holding, the burden that results from disallowing OOP voting for those who vote in the wrong precinct is absolute— their votes are not counted. In the 2014 midterm general election, 1184 voters who cast OOP ballots (among whom African Americans were disproportionately included) were effectively disfranchised as result of HB 589. J.A. 4482, 4484. And African Americans were disproportionately represented among the voters who cast OOP ballots in 2012 (7486 total OOP voters), 2010 (6052 total OOP voters), 2008 (6031 total OOP voters), and 2006 (3115 total OOP voters). J.A. 876, 986-987.

Similarly, the district court erred in discounting evidence of the impact of eliminating SDR because a relatively modest number of individuals attempted to register in 2014 during what used to be the SDR period. J.A. 24839 ("Plaintiffs also did not show that African-American turnout in 2014 would have been any higher had SDR been in place."). As with OOP voting, these individuals—who were disproportionately likely to be African American—were entirely excluded from the 2014 election. J.A. 4470-4472.

"[N]o amount of voter disenfranchisement can be regarded as '*de minimis.*'" *Florida* v. *United States*, 885 F. Supp. 2d 299, 318 (D.D.C. 2012). The district

court thus again erred in minimizing the burden faced by these out-of-precinct and SDR voters. "[W]hat matters for purposes of Section 2 is not how many minority voters are being denied equal electoral opportunities but simply that 'any' minority voter is being denied equal electoral opportunity." *LWV*, 769 F.3d at 244 (quoting 52 U.S.C. 10301(a)); see also *Frank* v. *Walker*, No. 15-3582, 2016 WL 1426486, at *2 (7th Cir. Apr. 12, 2016) ("The right to vote is personal and is not defeated by the fact that 99% of other people can secure the necessary credentials easily.").

2. *The District Court Ignored Evidence Of Burden Where The Right To Vote Was Not Completely Foreclosed*

The district court's analysis of what constitutes a cognizable burden would have required plaintiffs to show that—absent SDR or OOP voting—affected voters would not have registered to vote or cast a ballot at all. Notwithstanding this Court's previous holding that "[t]here can be no doubt that" the elimination of SDR, like the elimination of OOP voting, "disproportionately impact[s] minority voters," *LWV*, 769 F.3d at 245, the district court disregarded that impact based on the continuing availability of other registration and voting methods. *E.g.*, J.A. 24648 ("[S]tatistics about SDR use do not demonstrate what these particular voters, of any race, would have done had SDR not been an option, especially given that there are a multitude of easy ways to register in North Carolina apart from

SDR."); J.A. 24844 ("[T]he relatively small number of individuals who used OOP have many remaining convenient alternatives.").

Such reasoning repeats the district court's prior legal error, when it concluded that "because voting was not completely foreclosed and because voters could still register and vote by mail, a likely Section 2 violation had not been shown." *LWV*, 769 F.3d at 243. But as this Court has already held, "nothing in Section 2 requires a showing that voters cannot register or vote under any circumstance." *Ibid.* In again "waiving off disproportionately high African-American use of certain curtailed registration and voting mechanisms as mere 'preferences' that do not absolutely preclude participation," the district court erred. *Ibid.*

C.     *The District Court Failed To Correctly Apply The Legal Framework For Determining Whether A Burden Is Caused By Or Linked To The Social And Historical Legacy Of Race Discrimination*

The district court also failed to properly apply the second step of the test for vote denial and abridgment: whether the burdens disproportionately experienced by minority voters are "in part * * * caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *LWV*, 769 F.3d at 246 (citation and internal quotation marks omitted).

Proof of the Senate Factor evidence under the totality of the circumstances establishes the required linkage to the ongoing legacy of race discrimination. See, *e.g.*, *Mississippi State Chapter, Operation PUSH* v. *Allain*, 674 F. Supp. 1245, 1264 (N.D. Miss. 1987) (finding violation of Section 2 based on evidence including "socio-economic disparities" such as a "disproportionate lack of transportation, disproportionate inability to register during working hours," and disproportionate inability "to travel to the offices of the county registrar to register to vote"), aff'd, 932 F.2d 400. The district court erred by imposing a heightened causation standard with respect to Senate Factor 5 (socioeconomic effects of discrimination on political participation) and by failing to properly analyze the evidence regarding Senate Factor 9 (tenuousness).

1.     *The District Court Improperly Imposed A Heightened Causation Standard*

Despite finding under Senate Factor 5 that African Americans continue to bear the effects of historical discrimination, causing socioeconomic disparities that "hinder their political participation," J.A. 24727, the district court inappropriately required evidence that the burdens minority voters face under HB 589 are directly caused by historical discrimination. The court committed legal error by refusing to accept that an unlawful burden can result from the interaction of the challenged procedure with disparate socioeconomic circumstances and other vestiges of discrimination that minority voters face.

With respect to out-of-precinct voting, the district court held that the failure to vote in the assigned precinct was attributable to voter error or voter choice and not to "any connection with any effect of historical discrimination by the State of North Carolina or anyone else." J.A. 24847. Similarly, the court noted that "the data suggest that African Americans have an equal opportunity to participate in the electoral process without OOP" because of "the fact that a much larger number of African Americans endure socioeconomic disparities than the few who utilized OOP." J.A. 24844. To the district court, this meant that "something other than socioeconomic disparities is causing those voters to utilize" OOP voting. J.A. 24844. The court's reasoning—together with its repeated focus of finding fault with the individual voters who utilized OOP voting—has long been rejected by the courts. *E.g.*, *Marengo Cnty. Comm'n*, 731 F.2d at 1569 (rejecting the district court's reliance on voter "apathy unconnected with historical discrimination") (internal quotation marks omitted); *Kirksey* v. *Board of Supervisors*, 554 F.2d 139, 145 (5th Cir.) (en banc) (failure to register cannot be considered a matter of voter apathy without specific supporting evidence), cert. denied, 434 U.S. 968 (1977); *Veasey* v. *Perry*, 29 F. Supp. 3d 896, 919 (S.D. Tex. 2014) (rejecting the argument that "failure to overcome a burden to voting is nothing more than the individual's choice").

Plaintiffs were not required to prove that historical discrimination was directly causing individual minority voters to utilize OOP voting at higher rates than whites. Plaintiffs offered uncontested evidence that in multiple recent elections, African-American voters were more than *twice* as likely as whites to rely on OOP voting to have their votes counted. J.A. 876. Plaintiffs then offered ample evidence explaining how this wide racial disparity is linked to the history of racial discrimination: evidence that African Americans have more residential instability and far lower rates of access to a vehicle, as well as lower rates of income, education, and literacy. J.A. 22148-22156. These disparities make it more burdensome for voters to determine their assigned polling place and travel to it. It is thus more likely that African-American voters will present to vote at an incorrect polling place. J.A. 22228-22230; see also J.A. 4331-4333; J.A. 19622-19623; J.A. 20167, 20171-20172. These same socioeconomic disparities make it all the more difficult for affected minority voters, once informed that they are at the wrong precinct, to shoulder the burdens involved in travelling to their assigned polling place in order to cast a valid ballot—particularly given inflexible work hours and a comparative lack of access to transportation. J.A. 22228-22229. Proof of such totality of the circumstances evidence is all the causal linkage that Section 2 requires. Cf. *Clements*, 999 F.2d at 860 ("[T]he allocation of proof in § 2 cases

must reflect the central purpose of the Voting Rights Act and its intended liberality as well as the practical difficulties of proof in the real world of trial.").

The district court's improper insistence on a heightened causation requirement is found throughout its Section 2 results analysis. For example, the court dismissed the testimony of affected voters regarding SDR, stating that "[h]istorical discrimination is an unpersuasive basis for claiming that any of these people needed or wanted to use SDR" and that "the race of these voters played no role in their failure to vote." J.A. 24833, 24837. The court's resolution of plaintiffs' SDR claim depended both on its legally erroneous understanding of what is required to "link" a challenged practice to the ongoing effects of racial discrimination and the court's accompanying dismissal of exactly the evidence providing such a link.

Plaintiffs showed that eliminating SDR interacts with social and historical conditions to cause inequality in the opportunities enjoyed by African-American and white voters because African-American citizens, and particularly poor African-American citizens, move more often than their otherwise comparable white counterparts. This in turn necessitates that African-American voters re-register more often than whites—a requirement further exacerbated by the interaction of socioeconomic disparities, discrimination in education, and the post-HB 589 registration process itself. J.A. 22153-22156. This was not a case in

which plaintiffs asked the court to accept speculation about the interaction of these factors. Instead, plaintiffs showed exactly how these factors—given the removal of a fail-safe such as SDR—would interact. J.A. 22210-22212.[10]

But the district court disregarded evidence of this interaction, treating it as a function of North Carolina's registration requirement:

> It is easy to see a connection between certain reasons for ending up in the incomplete registration queue and literacy. But at the end of the day, these statistics are more a function of North Carolina's registration requirement – which has not been challenged – than a reflection of the need for SDR.

J.A. 24828 (footnote omitted). The court's reasoning is akin to holding that Section 2 plaintiffs may not challenge unequal access to polling places without challenging the underlying requirement to vote in person. That is obviously not the law. Plaintiffs need not challenge the entire registration process to show a

---

[10] In the November 2014 general election, African-American applicants comprised a much larger proportion of individuals who had difficulty completing the registration process, when compared to their share of registrants, than white applicants. J.A. 22211. Registrants whose applications were disrupted because of errors linked to literacy were disproportionately African Americans: 33% of applicants placed in the incomplete queue because of a failure to check the citizenship box were African American, as compared to 29% who were white, and 59% of those applications with a missing date of birth were submitted by African-American applicants, as compared to 22% by whites. J.A. 7750; J.A. 22211-22212; J.A. 24828 & n.196. In sharp contrast to the SDR process, which could catch and fix immediately these types of incomplete information, the post-HB 589 regime means that the disproportionately African-American pool of registrants in the incomplete queue will find itself unregistered on Election Day.

sufficient causal link between the elimination of SDR and race-related inequality of access. This district court committed legal error in concluding otherwise.

2.      *The District Court Erred In Its Consideration Of The Tenuousness Factor*

The district court committed further legal error as to Senate Factor 9, which looks to "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, or practice or procedure is tenuous." *Gingles*, 478 U.S. at 37 (citation omitted). "The principal probative weight of a tenuous state policy is its propensity to show pretext." *Terrazas* v. *Clements*, 581 F. Supp. 1329, 1345 n.24 (N.D. Tex. 1984) (three-judge panel). Here, because the district court never addressed the significant evidence showing the racially infected partisan motivations behind HB 589, see pp. 19-24, *supra*, it failed to consider that "[f]encing out" voters, or placing additional burdens on them because of how they are predicted to vote, cannot provide a legitimate interest for a state's election laws. *Carrington* v. *Rash*, 380 U.S. 89, 94 (1965); see also *Gomillion* v. *Lightfoot*, 364 U.S. 339 (1960); *Gaffney* v. *Cummings*, 412 U.S. 735, 751-754 (1973).

Analysis of the legislature's actual—not potential or hypothetical— motivations in enacting HB 589 is critical for two reasons. First, this Court has already held that "states cannot burden the right to vote in order to address dangers that are remote and only 'theoretically imaginable.'" *LWV*, 769 F.3d at 246

(citation omitted).  Second, the tenuousness factor allows courts to balance within the totality of the circumstances the weight of a state's interest in a challenged practice with the burden imposed on minority voters.  *Clements*, 999 F.2d at 871. But the district court here could not properly apply that legal framework because it failed to inquire into actual—rather than hypothetical—evidence of legislative motivation.

D.     *The District Court's Alternative Holding That Plaintiffs' Section 2 Results Claim Had No Proper Remedy Infected The Entirety Of Its Liability Analysis*

The district court's misplaced concerns about crafting a proper remedy, J.A. 24896-24910, demonstrate that the court improperly assumed that plaintiffs' Section 2 results claim was doomed from the start, regardless of the evidence put forward.  *E.g.*, J.A. 24906 (plaintiffs' claims fail because they lack "any principled measurement of equality of opportunity").

Plaintiffs never contended that the district court needed to determine how many days of SDR or early voting would ideally be needed to ameliorate unequal opportunity for African Americans.  That determination is not required under Section 2, nor would it be within the judicial role.  The question is not how best to remake North Carolina's voting and registration system but whether, given the totality of circumstances, the specific restrictions of a particular law—HB 589—

resulted in African-American voters having "less opportunity than other members of the electorate to participate in the political process." 52 U.S.C. 10301(b).

The district court thus erred in asserting that it lacked an adequate benchmark for measuring the burdens imposed by HB 589, claiming that it had "no way to assess where 'more equal'—but nevertheless allegedly discriminatory—ends and the 'equal opportunity' § 2 mandates begins." J.A. 24904. As the Sixth Circuit has held, "Section 2 vote denial claims inherently provide a clear, workable benchmark. * * * [U]nder the challenged law or practice, how do minorities fare in their ability to participate in the political process *as compared to other groups of voters*?" *Husted*, 768 F.3d at 556 (internal quotation marks omitted).

The district court's extensive reliance on *Holder* v. *Hall*, 512 U.S. 874 (1994), for the proposition that this case presents no feasible benchmark is both unpersuasive and telling. The plaintiffs in *Holder* v. *Hall* brought a Section 2 vote dilution claim against a single-member county commission. The question before the Supreme Court was "whether the size of a governing authority is subject to a vote dilution challenge under § 2 of the Voting Rights Act." *Id.* at 876. The Court did not reject the Section 2 claim on the merits, but instead held, as a categorical matter, that plaintiffs "cannot maintain a [Section] 2 challenge to the size of a government body." *Id.* at 885. *Holder* v. *Hall* explains not why a Section 2 dilution claim will falter on the merits, but when one cannot be brought at all. *Id.*

at 884-885.  Here, by contrast, no one can seriously argue that voter ID laws, rules on registration, election practices, and the like are not subject to Section 2 challenge; the only question is whether the specific practices at issue violate Section 2.

The district court's takeaway from *Holder* v. *Hall* appears to be that in addressing changes to voting practices—as here—a court is either applying a retrogression standard and benchmark from Section 5 of the VRA or is without a standard to apply at all.  J.A. 24899-24902.  But consideration of the fact that a state has changed its voting laws—and in a way that negatively and materially burdens African-American voters as compared to white voters—is plainly cognizable under Section 2 of the VRA.  As this Court previously held, the "fact that a practice or law eliminates voting opportunities that used to exist under prior law that African Americans disproportionately used is therefore relevant to an assessment of whether, under the current system, African Americans have an equal opportunity to participate in the political process as compared to other voters." *LWV*, 769 F.3d at 241-242 (citation omitted).  Indeed, the Supreme Court's decision in *Shelby County* squarely declared that discriminatory changes to election laws could continue to be addressed under "the permanent, nationwide ban on racial discrimination in voting found in § 2."  133 S. Ct. at 2631.

As such, it was legal error for the district court to again conclude that the only way to account for cutbacks in voting is through Section 5's retrogression standard. The inquiries under Section 2 and Section 5 are distinct. "[Section] 5 prevents nothing but backsliding" under its retrogression standard, whereas Section 2 prohibits "discrimination more generally" under its results standard. *Reno* v. *Bossier Parish Sch. Bd.*, 528 U.S. 320, 334-335 (2000). Simply considering— under the totality of circumstances—that a jurisdiction has eliminated a previously used practice is not the same thing as applying Section 5's retrogression standard.

Moreover, the district court's concern about a "standardless" remedy was a problem of its own creation. The question of whether "twenty" or "seventeen," or "thirteen or fifteen" days of early voting would provide minority voters with equal opportunity, in the abstract, was never a question that the court needed to answer. J.A. 24905. In voting cases it is a well-established principle that "the district court's modifications of" state law must be "limited to those [changes] necessary to cure any constitutional or statutory defect." *Upham* v. *Seamon*, 456 U.S. 37, 43 (1982) (per curiam). The "defect" in this case is that HB 589's restriction of certain voting practices was shown, in the localized totality of circumstances, to unlawfully abridge the rights of minority voters. Among other relief, see, *e.g.*, note 2, *supra*, a proper permanent injunction could simply have enjoined enforcement of HB 589's restriction or repeal of those voting mechanisms, leaving further

policy assessment to the legislature. Such an injunction would ensure that the courts do not unduly "pre-empt the legislative task nor intrude upon state policy any more than necessary." *Upham*, 456 U.S. at 41-43 (citation and internal quotation marks omitted); see also *Wise* v. *Lipscomb*, 437 U.S. 535, 540 (1978).

## CONCLUSION

This Court should reverse the judgment of the district court dismissing the United States' claims under Section 2 of the Voting Rights Act.

Respectfully submitted,

RIPLEY RAND
  United States Attorney for the Middle
    District of North Carolina

GILL P. BECK
  Special Assistant United States
    Attorney for the Middle District of
    North Carolina
  100 Otis Street
  Asheville, NC 28801
  (828) 259-0645

GREGORY B. FRIEL
JUSTIN LEVITT
    Deputy Assistant Attorneys General

  *s/ Anna M. Baldwin*
DIANA K. FLYNN
CHRISTINE H. KU
ANNA M. BALDWIN
    Attorneys
    Department of Justice
    Civil Rights Division, App. Section
    Benjamin Franklin Station
    P.O. Box 14403
    Washington, DC 20044-4403
    (202) 305-4278

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), that

the attached BRIEF FOR THE UNITED STATES AS APPELLANT:

(1) contains 13,985 words; and

(2) complies with the typeface requirements of Federal Rule of Appellate

Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate

Procedure 32(a)(6) because it has been prepared in a proportionally spaced

typeface using Word 2007, in 14-point Times New Roman font.

s/ *Anna M. Baldwin*
ANNA M. BALDWIN
 Attorney

Dated:  May 19, 2016

# CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2016, I electronically filed the foregoing BRIEF FOR THE UNITED STATES AS APPELLANT with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I certify that all participants in this case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that on May 20, 2016, I will cause four paper copies of this brief to be sent by certified U.S. mail, postage prepaid, to this Court and will cause one paper copy of the same to be mailed to the following counsel by certified U.S. mail, postage prepaid:

H. Christopher Coates
LAW OFFICE OF H. CHRISTOPHER COATES
934 Compass Point
Charleston, SC 29412

Christopher A. Fedeli
JUDICIAL WATCH
425 3rd Street, SW
Washington, DC 20024-0000

Gene B. Johnson
JOHNSON LAW FIRM, PA
P.O. Box 1288
Arden, NC 28704

Laughlin McDonald
ACLU VOTING RIGHTS PROJECT
2700 International Tower
229 Peachtree Street, NE
Atlanta, GA  30303

Amy M. Pocklington
OGLETREE DEAKINS NASH SMOAK & STEWART, PC
901 East Byrd Street
Richmond, VA  23219

s/ *Anna M. Baldwin*
ANNA M. BALDWIN
 Attorney
