RECORD NO. 16-1468(L)

In The

# United States Court of Appeals

### For The Fourth Circuit

_____

**NORTH CAROLINA STATE CONFERENCE OF THE NAACP; ROSANELL EATON; EMMANUEL BAPTIST CHURCH; BETHEL A. BAPTIST CHURCH; COVENANT PRESBYTERIAN CHURCH; BARBEE'S CHAPEL MISSIONARY BAPTIST CHURCH, INC.; ARMENTA EATON; CAROLYN COLEMAN; JOCELYN FERGUSON-KELLY; FAITH JACKSON; MARY PERRY; MARIA TERESA UNGER PALMER,**

*Plaintiffs – Appellants*,

**and**

**JOHN DOE 1; JANE DOE 1; JOHN DOE 2; JANE DOE 2; JOHN DOE 3; JANE DOE 3; NEW OXLEY HILL BAPTIST CHURCH; CLINTON TABERNACLE AME ZION CHURCH; BAHEEYAH MADANY,**

*Plaintiffs*,

**v.**

**PATRICK L. MCCRORY, in his official capacity as Governor of the state of North Carolina; KIM WESTBROOK STRACH, in her official capacity as a member of the State Board of Elections; JOSHUA B. HOWARD, in his official capacity as a member of the State Board of Elections; RHONDA K. AMOROSO, in her official capacity as a member of the State Board of Elections; JOSHUA D. MALCOLM, in his official capacity as a member of the State Board of Elections; PAUL J. FOLEY, in his official capacity as a member of the State Board of Elections; MAJA KRICKER, in her official capacity as a member of the State Board of Elections; JAMES BAKER, in his official capacity as a member of the North Carolina State Board of Elections,**

*Defendants – Appellees*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA AT GREENSBORO

_____

## BRIEF OF APPELLEES

_____

**THE LEX GROUP** ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# RECORD NO. 16-1468(L)

_____

## No. 16-1469

_____

**LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA; NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE; UNIFOUR ONESTOP COLLABORATIVE; COMMON CAUSE NORTH CAROLINA; GOLDIE WELLS; KAY BRANDON; OCTAVIA RAINEY; SARA STOHLER; HUGH STOHLER,**

*Plaintiffs*,

**CHARLES M. GRAY; ASGOD BARRANTES; MARY-WREN RITCHIE,**

*Intervenors/Plaintiffs*,

**and**

**LOUIS M. DUKE; JOSUE E. BERDUO; NANCY J. LUND; BRIAN M. MILLER; BECKY HURLEY MOCK; LYNNE M. WALTER; EBONY N. WEST,**

*Intervenors/Plaintiffs – Appellants*,

**v.**

**STATE OF NORTH CAROLINA; JOSHUA B. HOWARD, in his official capacity as a member of the State Board of Elections; RHONDA K. AMOROSO, in her official capacity as a member of the State Board of Elections; JOSHUA D. MALCOLM, in his official capacity as a member of the State Board of Elections; PAUL J. FOLEY, in his official capacity as a member of the State Board of Elections; MAJA KRICKER, in her official capacity as a member of the State Board of Elections; PATRICK L. MCCRORY, in his official capacity as Governor of the state of North Carolina,**

*Defendants – Appellees*.

**THE LEX GROUP** ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# RECORD NO. 16-1468(L)

_____

## No. 16-1474

_____

**LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA; NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE; UNIFOUR ONESTOP COLLABORATIVE; COMMON CAUSE NORTH CAROLINA; GOLDIE WELLS; KAY BRANDON; OCTAVIA RAINEY; SARA STOHLER; HUGH STOHLER.**

*Plaintiffs*,

**CHARLES M. GRAY; ASGOD BARRANTES; MARY-WREN RITCHIE,**

*Intervenors/Plaintiffs*,

**and**

**LOUIS M. DUKE; JOSUE E. BERDUO; NANCY J. LUND; BRIAN M. MILLER; BECKY HURLEY MOCK; LYNNE M. WALTER; EBONY N. WEST,**

*Intervenors/Plaintiffs – Appellants*,

**v.**

**STATE OF NORTH CAROLINA; JOSHUA B. HOWARD, in his official capacity as a member of the State Board of Elections; RHONDA K. AMOROSO, in her official capacity as a member of the State Board of Elections; JOSHUA D. MALCOLM, in his official capacity as a member of the State Board of Elections; PAUL J. FOLEY, in his official capacity as a member of the State Board of Elections; MAJA KRICKER, in her official capacity as a member of the State Board of Elections; PATRICK L. MCCRORY, in his official capacity as Governor of the state of North Carolina,**

*Defendants – Appellees*.

# RECORD NO. 16-1468(L)

_____

## No. 16-1529

_____

**UNITED STATES OF AMERICA,**

*Plaintiff – Appellant,*

**v.**

**STATE OF NORTH CAROLINA; NORTH CAROLINA STATE BOARD OF ELECTIONS; KIM WESTBROOK STRACH,**

*Defendants – Appellees.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA AT GREENSBORO

━━━━━━━━━━

## BRIEF OF APPELLEES

━━━━━━━━━━

Alexander McC. Peters
NORTH CAROLINA
  DEPARTMENT OF JUSTICE
Post Office Box 629
Raleigh, North Carolina  27602
(919) 716-6900




*Counsel for Appellees*
  *North Carolina and*
  *State Board of Election*

Karl S. Bowers, Jr.
BOWERS LAW OFFICE LLC
Post Office Box 50549
Columbia, South Carolina  29250
(803) 260-4124


*Counsel for Governor Patrick L. McCrory*

L. Gray Geddie, Jr.
Thomas A. Farr
Phillip J. Strach
Michael D. McKnight
OGLETREE DEAKINS NASH
  SMOAK & STEWART, PC
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina  27609
(919) 787-9700

*Co-Counsel for Appellees*
  *North Carolina and*
  *State Board of Election*

Robert C. Stephens
OFFICE OF THE GOVERNOR
  OF NORTH CAROLINA
20301 Mail Service Center
Raleigh, North Carolina  27699
(919) 814-2027

*Counsel for Governor Patrick L. McCrory*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 16-1468L       Caption: N.C. NAACP, et al. v. McCrory, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

State of North Carolina, Kim W. Strach, Rhonda K. Amoroso, Joshua D. Malcolm, Maja Kricker,
(name of party/amicus)

James Baker, and N.C. State Board of Elections.

who is _____ appellees _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
       If yes, identify any trustee and the members of any creditors' committee:

Signature:  /s/ Thomas A. Farr                          Date:      May 10, 2016

Counsel for:  N.C. Board of Elections appellees

## CERTIFICATE OF SERVICE
**************************

I certify that on      May 10, 2016      the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

/s/ Thomas A. Farr                                        5/10/2016
        (signature)                                              (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 16-1468L        Caption: N.C. NAACP, et al. v. McCrory, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Patrick L. McCrory
(name of party/amicus)

who is _____ appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                             ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Karl S. Bowers, Jr.                    Date:    May 10, 2016

Counsel for: Patrick L. McCrory

## CERTIFICATE OF SERVICE
**************************

I certify that on    May 10, 2016    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Karl S. Bowers, Jr.                              5/10/2016
    (signature)                                        (date)

- 2 -

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT .................................................... 5

STATEMENT OF ISSUE PRESENTED FOR REVIEW ...................... 5

STATEMENT OF THE CASE ............................................................. 5

    A.    Procedural Background ....................................................... 5

    B.    Factual Background.............................................................. 6

        Early Voting ....................................................................... 6

        SDR .................................................................................... 8

        OOP Voting....................................................................... 12

        Photo Identification ........................................................ 14

        Pre-registration ............................................................... 25

SUMMARY OF ARGUMENT .......................................................... 27

ARGUMENT ..................................................................................... 27

    I.    Standard of Review .......................................................... 27

    II.    Plaintiffs' Fourteenth Amendment Claims Fail ................. 29

    III.    Plaintiffs' Section 2 Claims Fail ....................................... 36

    IV.    Plaintiffs' Intentional Discrimination Claims Fail.............. 44

V.    Plaintiffs' Twenty-Sixth Amendment Claims Fail ............................55

CONCLUSION .........................................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amadeo v. Zant,*
    486 U.S. 214 (1988)......................................................................28

*Anderson v. Bessemer Cty.,*
    470 U.S. 564 (1985)......................................................................28

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983)..................................................................29, 30

*Arlington Heights v. Metro Housing Dev. Corp.,*
    429 U.S. 252 (1977)............................................................35, 45, 52

*Bartlett v. Strickland,*
    556 U.S. 1 (2009)..........................................................................41

*Burdick v. Takushi,*
    504 U.S. 428 (1992)..........................................................29, 30, 33

*Burns v. Fortson,*
    410 U.S. 686 (1973)......................................................................32

*Bush v. Vera,*
    517 U.S. 952 (1996)..................................................................53, 54

*Crawford v. Marion Cnty. Elections Bd.,*
    553 U.S. 181 (2008)....................................................30, 31, 35, 48

*Florida v. United States,*
    885 F. Supp. 2d 299 (D.D.C. 2012).......................................... 9-10

*Frank v. Walker,*
    768 F.3d 744 (7th Cir. 2014) ..........................................36, 37, 38

*FTC v. Ross*,
    743 F.3d 886 (4th Cir. 2014) ...............................................................27, 28

*Gaunt v. Brown*,
    341 F. Supp. 1187 (S.D. Ohio 1972), *aff'd*,
    409 U.S. 809 (1972)...........................................................................................56

*Hall v. Virginia*,
    385 F.3d 421 (4th Cir. 2004) ........................................................................41

*Harris v. McCrory*,
    __ F. Supp. 3d __, 2016 WL 482052 (Feb. 5, 2016 M.D.N.C.)...................54

*Helton v. AT&T, Inc.*,
    709 F.3d 343 (4th Cir. 2013) ........................................................................27

*Hoffman v. Maryland*,
    928 F.2d 646 (4th Cir. 1991) ........................................................................53

*Holder v. Hall*,
    512 U.S. 874 (1994).........................................................................................41

*Ill. Bd. of Elections v. Socialist Workers Party*,
    440 U.S. 173 (1979).........................................................................................29

*Irby v. Va. State Bd. of Elections*,
    889 F.2d 1352 (4th Cir. 1989) ......................................................................36

*James v. Bartlett*,
    359 N.C. 260, 607 S.E.2d 638 (2005) ..........................................................33

*Johnson v. Governor of State of Fla.*,
    405 F.3d 1214 (11th Cir. 2005) ....................................................................36

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ...............................................................*passim*

*Marston v. Lewis*,
    410 U.S. 679 (1973).........................................................................................32

iv

*Miller v. Johnson*,
　　515 U.S. 900 (1995).................................................................35

*Munro v. Socialist Workers Party*,
　　479 U.S. 189 (1986).................................................................29

*Norman v. Reed*,
　　502 U.S. 279 (1992).................................................................29

*Ohio State Conference of NAACP v. Husted*,
　　768 F.3d 524 (6th Cir. 2014), *vacated*,
　　No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014) ......................37, 38

*PCS Nitrogen, Inc. v. Ashley II of Charleston, LLC*,
　　714 F.3d 161 (4th Cir. 2013) ....................................................28

*Reno v. Bossier Parish School Bd.*,
　　520 U.S. 471 (1997).................................................................41

*Schweiker v. Wilson*,
　　450 U.S. 221 (1981).................................................................35

*Shelby County v. Holder*,
　　133 S. Ct. 2612 (2013).............................................................4, 49

*South Carolina v. United States*,
　　898 F. Supp. 2d 30 (D.D.C. 2012)...........................................20, 42

*Storer v. Brown*,
　　415 U.S. 724 (1974).................................................................29

*Sugarman v. Dougall*,
　　413 U.S. 634 (1973).................................................................29

*Thornburg v. Gingles*,
　　478 U.S. 30 (1986)...........................................................*passim*

*United States Railroad Retirement Board v. Fritz*,
　　449 U.S. 166 (1980).................................................................35

*United States v. O'Brien*,
    391 U.S. 367 (1968).......................................................................54

*Veasey v. Abbott*,
    71 F. Supp. 3d 627 (S.D. Tex.), *vacated and remanded*,
    796 F.3d 487 (5th Cir. 2015), *petition for rehearing en banc granted*,
    815 F.3d 958 (5th Cir. 2016) ....................................................52, 53, 54, 55

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I.................................................................................29

U.S. Const. amend. XIV......................................................................*passim*

U.S. Const. amend. XXVI.................................................................25, 55, 56

## STATUTES

28 U.S.C. § 1291.........................................................................................5

28 U.S.C. § 1331.........................................................................................5

42 U.S.C. § 1973gg *et seq*.........................................................................30

52 U.S.C.A. § 10502(d) ..............................................................................32

52 U.S.C.A. § 20501 *et. seq*......................................................................30

52 U.S.C.A. § 20507(a)(1)...........................................................................32

52 U.S.C.A. § 21082(a)(4)...........................................................................33

N.C. Gen. Stat. § 163-55(a)(1).....................................................................25

N.C. Gen. Stat. § 163-59.............................................................................25

N.C. Gen. Stat. § 163-166.13.................................................................15, 16

N.C. Gen. Stat. § 163-166.13(c)(2)..............................................................16

N.C. Gen. Stat. § 163-166.15 .................................................................16

N.C. Gen. Stat. § 163-182.1A .................................................................15

N.C. Gen. Stat. § 163-182.1B(b)(6) ........................................................16

## **OTHER AUTHORITIES**

2009 N.C. Sess. Law 541 § 7(a) ..............................................................25

2013 N.C. Sess. Law 381 ...............................................................*passim*

2015 N.C. Sess. Law 105 ...............................................................1, 15

## INTRODUCTION

After over four weeks of trial, the district court entered a 479-page order thoroughly analyzing the record evidence.  (J.A. 24479-24963 (Op. pp. 1-485)) The district court examined over 25,000 pages of exhibits and listened to the testimony of dozens of fact witnesses and expert witnesses.  The district court concluded that appellants League of Women Voters, NC NAACP, Duke-Intervenors, and the United States (collectively "plaintiffs") failed to demonstrate that North Carolina's election law reforms of 2013 were unconstitutional or unlawful in any respect.

The district court's ruling should not have surprised plaintiffs as the challenged law, N.C. Sess. Law 2013-381 ("SL 2013-381"), as amended by N.C. Sess. Law 2015-105 ("SL 2015-105") (collectively referred to as SL 2013-381), simply returned North Carolina's election system to the mainstream of election systems used throughout the United States, including states immediately surrounding North Carolina with similar demographics and history.  In particular, SL 2013-381 repealed multiple election practices used by only a few states, such as same-day registration ("SDR"), out-of-precinct voting ("OOP"), and pre-registration of 16-year olds.  The law also increased early voting opportunities by eliminating the first seven days of the early voting period and replacing them with an hours matching requirement designed to increase the number of early voting

sites and voting hours. Finally, North Carolina enacted a reasonable photo identification requirement that allows voters who cannot obtain photo identification to vote upon completing a form that is no more onerous than the forms for completing SDR (which plaintiffs ask this Court to reinstate).

The district court's decision is primarily based on its factual findings and assessment of the evidence. These findings may not be disturbed unless they are clearly erroneous. Plaintiffs' failure to meet their evidentiary burden extends to both prongs of this Court's test from *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ("*LWVNC*"). First, plaintiffs did not show that North Carolina's post-SL 2013-381 election system amounted to a "*discriminatory* burden." Instead, as to SDR, OOP, pre-registration, and early voting, plaintiffs based their entire case on one fact: disparate African American use of these practices in specific elections prior to 2013. Yet plaintiffs did not prove that it was the election practices themselves, rather than other factors such as the Obama campaign spending and strategy, that were responsible for increased registration and turnout by African Americans in 2008 and 2012. Moreover, in putting all of their evidentiary eggs into the one "disparate use" basket, plaintiffs failed to demonstrate how alleged disparate use prior to 2013 translated into *unequal* opportunities after 2013 for the actual voters who had used these practices.

2

Second, plaintiffs failed to establish (with evidence rather than speculation) any connection or link between African American use of these practices and socioeconomic factors affecting African Americans in general. They failed to do so even though their experts admitted such evidence could be produced. For example, in 2012, 99.67% of African Americans cast ballots other than OOP ballots.[1] (J.A. 24663 (Op. p. 185)) No evidence was offered that the .33% of African Americans who used OOP voting in 2012 are the only African American voters who suffer from socioeconomic disparities. Why are so many African Americans with low socioeconomic status able to vote in their correct precinct if socioeconomic disparities are allegedly "linked to" OOP voting? Plaintiffs could have answered this question with evidence, but as the district court repeatedly explained, they simply did not do so. Similarly, plaintiffs' own evidence claimed that over 94% of African Americans possessed identification acceptable under SL 2013-381. (J.A. 24569 (Op. p. 91)) As with OOP voting, this fact alone demonstrates that socioeconomic disparities experienced by African Americans generally are not linked or connected to possession rates of photo identification. In short, plaintiffs' case failed for lack of evidence. Their failure of proof does not lie at the feet of the district court.

---

[1] According to plaintiffs' expert Charles Stewart, in the 2014 general election 99.9% of African Americans cast ballots other than OOP ballots. Only .17% cast OOP ballots. (J.A. 19651)

For the same reasons, plaintiffs failed to prove that SL 2013-381 is an unconstitutional burden on any voters, much less African American voters. Prior to 2000, North Carolina did not allow early voting, SDR, or OOP voting. (J.A. 24488 (Op. p. 10)) If an election system without those conveniences is unconstitutionally burdensome, then North Carolina was in violation of the United States Constitution for decades. Plaintiffs provided no evidence that returning to a former election system that was constitutional is nevertheless unconstitutional.

Finally, plaintiffs' claims of intentional or purposeful discrimination are baseless. Plaintiffs' intentional discrimination claims, like their Section 2 results claims, rely on essentially one piece of evidence. For the intent claims, it is the fact that changes to House Bill 589 ("HB 589") were made in the North Carolina Senate after the Supreme Court's decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013). This is a thin reed on which to accuse North Carolina of intentional race discrimination. Plaintiffs did not produce any evidence of a racial motive in the changes made to the bill in the State Senate but instead asserted such motives solely because *Shelby County* was a case involving the Voting Rights Act. Putting aside the fact that it would be logical and rational to wait for the outcome of that decision in order to know the legal standards that would apply to an election reform bill, it would be absurd to find a state guilty of intentional discrimination

solely because the state waited on the outcome of a case pending in the Supreme Court before enacting legislation.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. The district court entered judgment for defendants on April 25, 2016. (JA 24964-24966) The private plaintiffs appealed on April 26, 2016 and the United States appealed on May 6, 2016. (JA 24967-24979; 24980-24981) This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

Did the district court properly enter judgment for defendants on all of plaintiffs' claims?

## STATEMENT OF THE CASE

**A.    Procedural Background**

The procedural history of these cases is described at length in the district court's April 25, 2016 Memorandum Opinion and Order. (J.A. 24521-24528 (Op. pp. 49-56[2]))

---

[2] References to page numbers in the April 25, 2016, Memorandum Opinion and Order are to the ECF page numbers.

**B.    Factual Background**

Defendants incorporate by reference the recitation and analysis of the facts adopted by the district court.  (J.A. 24479-24963 (Op. pp. 1-485))  Defendants summarize that evidence as follows.

<u>Early Voting</u>

Prior to SL 2013-381, each county board of election ("CBE") could schedule early voting for up to 17 days, with the last day ending on the last Saturday before election day. (J.A. 24493-24494 (Op. pp. 15-16)) CBEs were required to offer early voting during business hours at the CBE offices or an alternative location, and also had the option of offering early voting at other locations in the county. There were no statewide rules on the number of early voting hours that had to be provided by each county. (J.A. 24492-24494 (Op. pp. 14-16))

Many states do not provide any early voting period for voters.  In 2014, the median number of early voting days by states that provided early voting was 11. (J.A. 24611 (Op. p. 133))  Moreover, the availability of early voting involves many factors other than the number of days available in an early voting period. (J.A. 24619-24620 (Op. pp. 141-142))

The North Carolina General Assembly was aware that early voting sites and hours had been previously established by CBEs to benefit the residential patterns of Democratic voters. (J.A. 24492 & n. 7, 24761 (Op. pp. 14, 283)) In enacting SL

2013-381, the General Assembly responded to these reports by requiring that all early voting sites in a county be open on the same days and at the same times. The General Assembly also decreased the number of days CBEs could schedule early voting from 17 to 10, but required a benchmark for the number of early voting hours that each CBE must make available. (J.A. 24761-762 (Op. pp. 282-83)) CBEs can obtain waivers from this requirement only upon a unanimous vote by both the CBE and the North Carolina State Board of Elections ("SBE"). (*Id.*)

Plaintiffs' expert witnesses predicted that African American voters would suffer disproportionately from the reduction of early voting days. (J.A. 24617-618, 24620, 24628, 24630-24631 (Op. pp. 139-40, 142, 150, 152-53)) While there is no dispute that African American voters disproportionately used early voting in 2008 and 2012, there is no evidence linking this disproportionate use to any of the "*Gingles* factors," including lower economic and educational attainments by African Americans as compared to whites. (J.A. 24618 (Op. p. 140)) Moreover, following the 2014 general election, participation of African American voters *increased* at a *higher* rate than the increase among white voters. (*Id.*) As found by the district court, African American voters did not face a discriminatory burden which impacted their opportunity to participate in early voting. (J.A. 24633-24636 (Op. pp. 155-58)) Instead, the new law resulted in an increased number of early voting locations in each county and an increase in evening hours and weekend

voting. (*Id*.) This requirement has made early voting *more convenient* and less burdensome for *all* voters, *including* all minority voters. (*Id*.)

SDR

The court below made extensive findings of fact showing the absence of *any* link between the *Gingles* factors, including lower educational and economic attainments by African Americans, and SDR. (J.A. 24636-24660, 24765-24792 (Op. pp. 158-182, 287-314))  A majority of states, including South Carolina and Virginia, do not provide for either SDR (allowing registration during early voting) or election day registration ("EDR") (allowing voters to register and vote on election day). (J.A. 24637 (Op. 159)) In fact, North Carolina was the only state that provided only for SDR, and SDR was not even allowed in North Carolina until the 2008 election cycle.  (J.A. 24636, 24638 (Op. pp. 158, 160))

The court below found that African Americans disproportionately used SDR during the 2008 and 2012 general elections. (J.A. 24826-827 (Op. pp. 348-49)) Plaintiffs' experts agreed, however, that African American participation in early voting and SDR was significantly impacted by the resources devoted by the Obama campaign's targeting these practices for desirable voters. (J.A. 24832, 24914 (Op. pp. 354, 437))   Similar increased African American participation occurred in other states without early voting and SDR. (J.A. 24646 (Op. p. 168)) Plaintiffs' experts conceded that the academic literature has found no link between

8

SDR and increased turnout. None of their experts conducted a study attempting to link increased minority turnout to SDR. (J.A. 24833-24955 (Op. pp. 354-55, 477))

The trial court also found that North Carolina offers voters many other opportunities to register and that African American registration rates as a percentage of voting age population ("VAP") are *higher* than white registration rates. (J.A. 24642, 24828-24832, 24924, 24956-24957 (Op. pp. 164, 350-54, 446, 478-79)) In fact, the gap between African American registration rates as compared to white registration rates *increased* from 7.5% following the 2012 elections to 7.8% following the 2014 elections. (J.A. 24643-24644 (Op. pp. 165-166)) In fact, the registration advantage enjoyed by African Americans as compared to whites decreased during an off-year election that included SDR but increased in an off-year election for which SDR had been eliminated. (J.A. 24493, 24497-24498, 24644 (Op. pp. 15, 19-20, 166))[3]

The court below noted that the elimination of SDR would have been precleared under Section 5 based upon this evidence. (J.A. 24854-24855 (Op. pp. 376-77)) This is so because under Section 5, disparate use of an election practice by a minority group is insufficient to deny preclearance. *Florida v. United States*,

---

[3] The availability of these numerous other registration opportunities is clearly effective. In the recent statewide March primary, the percentage of African Americans voters using SDR was only 20.39%, which is less than the percentage seen in previous comparable elections. (Doc. 121-2, ¶ 8 "6/3/2016 Strach Declaration") This is persuasive evidence that African Americans have been able to use non-SDR registration avenues effectively.

885 F. Supp. 2d 299, 312 (D.D.C. 2012); (Doc. 439, p. 181 & n. 110). In fact, it was undisputed that African American registration and turnout increased in 2014, after SDR was eliminated, as compared to 2010 when SDR was in place. (J.A. 24832-24833, 24854-24855 (Op. pp. 354-55, 376-77))

Thus, as the district court found, plaintiffs are asking this Court to find a violation based *solely* on the disproportionate use of SDR by minorities during the 2008 and 2012 elections. (J.A. 24863 (Op. p. 385)) None of their experts testified that SDR has increased turnout anywhere in the United States; that African American participation rates in North Carolina increased because of SDR; or that registration and turnout of African American voters in 2014 would have been higher if SDR had been in place. (J.A. 24858-24861, 24956 (Op. pp. 380-383, 478)) There is simply no evidence that the elimination of SDR resulted in a denial or abridgment of the voting rights of minority voters. (J.A. 24860-24863 (Op. pp. 382-383))

Finally, the facts found by the court below strongly support the policy advanced by the elimination of SDR. It is reasonable for states to adopt a procedure for verifying the residence information provided by an applicant for registration. (J.A. 24957 (Op. p. 479)) North Carolina verifies registrants with a mail verification system. (J.A. 24767-769 (Op. pp. 289-291)) If the first letter mailed to the registrant is not returned to the CBE, the applicant is verified and his

vote counted if the applicant presents to vote. (J.A. 24768 (Op. p. 290)) If the first letter is returned to the CBE, a second letter is mailed to the registrant at the address listed on the application. (J.A. 24768-24769 (Op. pp. 290-91)) If the second letter is not returned, the applicant is considered verified and allowed to vote. (*Id.*) But, if the second letter is returned, the voter is considered unverified and his vote will not be counted if he or she presents to vote. (*Id.*)

The primary limitation with mail verification is the time it takes for the process to be completed. (J.A. 24838 (Op. p. 360)) In 2009, the SBE explained the problems with mail verification for SDR voters−long before the General Assembly eliminated the practice in 2013. (J.A. 24771 (Op. p. 293))  Contrary to this Court's prior opinion, the problem is not with early voters who are verified after election results are certified. As the district court explained, the problem is with voters who fail mail verification because the second letter is returned to the CBE *after* the applicant's vote has been counted and the results of the election certified. Any applicant who failed mail verification before the election results are certified would be considered an illegal voter and his vote would not be counted. Persons who fail mail verification *after* the election results are certified are casting a vote that is equally unverified and equally illegal, yet their ballots have already been illegally counted. (J.A. 24767-24783 (Op. pp. 289-305))

11

This is not a mere academic problem. The district court found that 2.44% of SDR registrants in 2012 (2,361 out of 97,373) failed mail verification after election results were certified and their votes illegally counted. (J.A. 24779, 24838, 24926 (Op. pp. 301, 360, 448)) In contrast, only 0.34% (2,306 out of 680,904) of non-SDR registrants failed mail verification after election results had been verified and their vote illegally counted. (J.A. 24779 (Op. p. 301))  Further, the court found that 95.6% of non-SDR registrants passed mail verification before voting, while 96.2% of SDR registrants voted before they passed mail verification. (*Id.*) This evidence provides more than ample ground for North Carolina to adopt the rule followed by a majority of the states who do not allow SDR. (J.A. 24925-24927 (Op. pp. 447-449))

OOP Voting

From 2005 until 2013, North Carolina allowed voters to cast ballots in the wrong precinct so long as they voted within the county of their residence. (J.A. 24660 (Op. p. 182)) A majority of states do not allow OOP voting. The court below made extensive findings of fact on OOP that are not clearly erroneous. (J.A. 24660-24668, 24792-24801 (Op. pp. 182-190, 314-323))

OOP voting applied only to election day voters. (J.A. 24660 (Op. p. 182)) Voters who cast OOP ballots would only have their vote counted for those elections on the ballot they received for which they were eligible to vote. (J.A.

24661 (Op. p. 183)) Because of this restriction, OOP voting actually operated to disenfranchise voters for some district elections. (*Id.*)

During the 2012 general election, 99.67% of African American voters and 99.81% of white voters cast ballots other than OOP ballots. (J.A. 24662 (Op. p. 184)) Within this very small group of voters, African Americans were more likely to cast OOP ballots than whites.[4] (*Id.*) But there is no evidence that African Americans were more likely to cast OOP ballots than whites because of any of the *Gingles* factors. Nor did plaintiffs present any evidence that African American OOP voters were less educated or well off economically than any voters, including African American voters who cast ballots in another manner.[5]

The facts found by the trial court affirmatively showed that OOP voters did not vote OOP because of any of the *Gingles* factors. (J.A. 24856-24857, 24859

---

[4] Because over 99% of both black and white voters cast ballots other than OOP ballots, the elimination of OOP voting had no disproportionate impact on African American voters as a group as compared to white voters as a group.

[5] At trial, plaintiffs presented a witness from Democracy NC in an attempt to prove the injury caused by the elimination of OOP voting. (J.A. 24664-665 (Op. 186-87)) This witness was stationed at one precinct and reported that 59 persons had come to the precinct and then left because they were told they were at the wrong precinct. (J.A. 24665 (Op. p. 187)) This evidence was offered to prove an alleged link between the *Gingles* factors and the elimination of OOP voting. Upon further examination, the evidence showed that only 52 persons on the list provided by Democracy NC were actually registered to vote. (*Id.*) Out of these 52 persons, 49 actually voted on election day. (*Id.*) Of the three persons eligible to vote who did not vote, two were a married white couple. (*Id.*) The third person was an African American who was not eligible to vote in the 2014 general election and the fact that his vote was not counted had no connection whatsoever to the elimination of OOP voting. (*Id.*)

(Op. pp. 378-79, 381)) Seventy-four percent of all OOP voters in 2014 and 74% of African American OOP voters in 2014 had voted in their assigned precinct in prior elections. (J.A. 24666 (Op. p. 188)) Further, African American OOP voters were more likely to vote in a precinct that was closer to their assigned precinct than were white voters. (J.A. 24667 (Op. p. 189)) Thus, any alleged travel burden was more heavily borne by white voters. (*Id.*) And while OOP was in place, groups dedicated to turning out minority voters intentionally took voters to precincts without checking on whether the voters were assigned to that precinct, thus inflating the number of minority OOP voters as compared to white OOP voters. (J.A. 24796 (Op. p. 318)) Significantly, in 2014, when OOP was eliminated, the NC NAACP actually encouraged members to take some voters to the wrong precinct to create "evidence" to be used in this case. (J.A. 24654 & n. 108 (Op. p. 176)) The district court detailed why North Carolina and a majority of other states do not offer OOP voting. (J.A. 24792-24801 (Op. pp. 314-323))

Photo Identification

Prior to 2016, North Carolina relied upon a system of signature attestation by voters to identify and prevent voter fraud. (J.A. 24488-24489 (Op. pp. 10-11)) Poll workers would ask for identifying information, after which the person would be asked to sign an "authorization to vote" form ("ATV"). (*Id.*) The ATV included a warning that fraudulently completing the form constitutes a "Class I Felony."

14

(*Id.*)  Copies of voters' signatures were not available to poll workers so signatures could not be verified at each polling place. (*Id.*) And, unless the poll worker knew the person presenting to vote, poll workers had very limited methods for determining whether the voter was the same person as the registrant.  (*Id.*)

On June 15, 2015, the legislature ratified SL 2015-105, which made several changes to the original photo identification requirement in SL 2013-381. As amended, North Carolina's photo identification requirement provides:

1.    Beginning in 2016, voters who have a qualifying photo identification "bearing any reasonable resemblance to that voter" must present the identification to vote in person at early voting sites, at the precincts on election day, or at the CBE after casting a provisional ballot. N.C. Gen. Stat. §§ 163-166.13, 163-182.1A; N.C. Sess. Law 381, § 6.2.

2.    Acceptable photo identification includes: (1) a North Carolina driver's license, learner's permit, or provisional license (expired up to four years); (2) a special non-operator's identification card (expired up to four years); (3) a United States passport; (4) a United States military identification card; (5) a Veterans Identification card issued by the United States Department of Veterans Affairs; (6)  a tribal enrollment card issued by a federally recognized tribe; (7)  a tribal enrollment card issued by a tribe recognized by North Carolina; (8) a driver's

15

license or non-operator's identification card issued by another state or the District of Columbia so long as the voter registered to vote within ninety days of election day. N.C. Gen. Stat. § 163-166.13.

3.  Those who do not have qualifying photo identification and who state a reasonable impediment to getting one, can vote in person without photo identification as long as they provide alternative identification (such as their social security number or documents such as a lease or pay stub) and complete a reasonable impediment declaration. N.C. Gen. Stat. §§ 163-166.13(c)(2), 163-166.15. The "reasonableness" of the impediment cannot be challenged. Only the voter's subjective belief is relevant to the reasonableness inquiry. N.C. Gen. Stat. § 163-182.1B(b)(6).

4.  Curbside voters, those with religious objections to being photographed, certain victims of natural disasters, and absentee mail voters are exempt from the photo identification requirement.

(J.A. 24522-24523 (Op. pp. 44-45))

The photo identification law was first enforced during the 2016 March primary. Although this primary occurred after the evidentiary record in these cases had closed, the Court can take judicial notice that over 2.32 million North Carolinians voted in that primary. (Doc. 121-2, ¶ 5) In total, 1,048 provisional

16

voters claimed that a reasonable impediment prevented them from obtaining acceptable photo identification. (*Id.*) Of these provisional votes, only 184 were unable to cast ballots that were counted because their reasonable impediment declaration was not accepted. (*Id.*)

Plaintiffs argued that because minorities are allegedly less educated and less affluent than other voters, they are less able to navigate the process needed to obtain photo identification or cast a reasonable impediment ballot.[6] The district court found, however, that their own evidence disproved their claims. For instance, plaintiffs relied on an expert report by Dr. Charles Stewart purportedly showing that registered African American voters lack acceptable photo

---

[6] In fact, plaintiffs' evidence rests upon the dubious and racially stereotypical proposition that African American voters were allegedly "habituated" to the modified or repealed practices and lacked the ability to adjust to changes in elections law. Dr. Paul Gronke is the proponent of the term "habituated." (J.A. 19825) His testimony was not credited by the district court. (J.A. 24617-24618, 24627-24630, 24640-24642) (Op. pp. 139-40, 149-52, 162-64)) Dr. Gronke admitted at trial that only individuals develop habits and not groups. (J.A. 19826) Dr. Gronke admitted that he never studied the voting patterns of any individual voters. (J.A. 19827-19828) He attempted to prove his habituation theory by showing the number of black voters who voted in 2012 but who did not vote in 2014. However, Dr. Gronke did not make the same comparison for African Americans who voted in 2008 but who did not vote in 2010, an election where the state retained 17 days of early voting, SDR and OOP voting. The evidence showed that the drop off of African American voters in 2010, as compared to 2008, was greater than the drop off of African American voters who voted in 2012 but did not vote in 2014. Indeed, voters allegedly habituated to voting in the first 7 days during the 17 day early voting periods in 2008, 2010 and 2012 were in fact more likely to vote during the 10 day early voting period in 2014. (J.A. 24628-24631 (Op. pp. 150-53))

identification at a higher rate than white voters (but which really only identified voters possibly "unmatched" between the SBE and DMV databases). Even under Dr. Stewart's analysis, over 94% of all registered African American voters were matched to an acceptable form of photo identification. (J.A. 24572 (Op. p. 94 and n. 58))   Plaintiffs presented no evidence explaining why over 94% of registered African American voters could navigate the process of obtaining photo identification, despite their lower educational and economic attainments, while the remaining 6% of registered African American voters could not. Further, none of plaintiffs' experts attempted to compare the educational and economic attainments of registered black voters Dr. Stewart was unable to match versus the educational and economic attainments of African American voters who obtained identification.

As with their other claims, plaintiffs relied primarily on one piece of evidence that African Americans would be more "burdened" by the photo identification requirement than whites: the allegation that African Americans possess photo identification at a lower rate than whites.  But the district court found no credible evidence that African Americans who are still registered in North Carolina, and are actually interested in voting, actually possess photo identification as a group at a rate that is lower than white voters. (J.A. 24572 (Op. p. 94))

18

The district court found Dr. Stewart's analysis full of flaws. Dr. Stewart's first matching report was based upon a July 16, 2014 snapshot of the voter registration files. (*Id.*) He found that 397,971 registered voters (6.1%) could not be matched to qualifying identification, that 147,111 African Americans (10.1%) could not be matched, and that 212,656 (4.6%) of white registered voters could not be matched. (J.A. 24568 (Op. p. 90)) In December 2015, Dr. Stewart updated his analysis for trial by continuing to use the July 2014 SBE snapshot and offered his 2015 report as the "best estimate" of current conditions. Thus, Dr. Stewart's report does not account for the educational and outreach effort by SBE personnel in the meantime. Moreover, Dr. Stewart's December 2015 matching report reduced the size of his no-match list to only 173,108 voters. Dr. Stewart found that only 83,470 of registered African American voters could not be matched (5.7%) as compared to 116,344 unmatched white voters (2.5%). (J.A. 24568-24569 (Op. pp. 90-91))

Thus, in summary, Dr. Stewart's final report found that 94.3% of all registered African American voters had successfully navigated the process to obtain qualifying photo identification while 97.5% of white voters could be matched. Further, Dr. Stewart agreed that he was able to match 96.5% of all registered voters. (J.A. 24569 (Op. p. 91))

Other flaws in Dr. Stewart's report undermined plaintiffs' claims. For example, Dr. Stewart's North Carolina report was not consistent with his report in

*South Carolina v. United States*, 898 F. Supp. 2d 30 (D.D.C. 2012), a case in which his client, the United States Department of Justice, unsuccessfully opposed preclearance of South Carolina's nearly identical photo identification/reasonable impediment law. (*Id.*) In South Carolina, Dr. Stewart was able to use a unique identifier because registered voters in that state must provide a full social security number. (*Id.*) By contrast, in North Carolina, he made multiple (and less precise) "sweeps" of the data using less precise identifiers. (*Id.*) More critically, in South Carolina, Dr. Stewart eliminated from his matching analysis voters classified as inactive on the ground that inactive voters are less likely to vote in the future and likely to be moved to a status in South Carolina known as "archived." (*Id.*) In contrast, Dr. Stewart declined to remove inactive voters from his final North Carolina report, which inflated his list. (J.A. 24569-24572 (Op. pp. 91-94))

Dr. Stewart knew the difference between North Carolina's active and inactive voters and had broken down his results based upon each status in his first North Carolina report. (*Id.*) After admitting during cross-examination that he had not eliminated inactive voters in his December 2015 report, Dr. Stewart produced an additional exhibit which removed inactive voters. (*Id.*) This dropped the number of active voters who could not be matched to 151,005 or only 2%. (*Id.*) By race, unmatched African American active voters dropped to 60,312 (4.8%) compared to 73,143 active white voters (1.8%). (*Id.*) After he removed inactive

20

voters, Dr. Stewart was able to match 95.2% of African American active voters as compared to 98.2% of active white voters. (*Id.*)

Thus, Dr. Stewart was able to match a higher percentage of active and inactive North Carolina voters than he did for only active voters in South Carolina. This is also true when broken down by race (94.3% of all active and inactive registered North Carolina African Americans in North Carolina versus 90.5% of only active South Carolina African American voters; 97.5% of active and inactive North Carolina white registered voters versus 94.5% of active South Carolina white registered voters). (J.A. 24571 (Op. p. 93)) The difference becomes more pronounced when only active voters are considered (97.4% of all North Carolina active registered voters versus 93.3% in South Carolina; 95.2% of all active African American registered voters in North Carolina as compared to 90.5% in South Carolina; 98.2% of all active registered white voters in North Carolina as compared to 94.5% in South Carolina). (J.A. 24571-24572 (Op. pp. 93-94)) This comparison is notable because the percentage of matched voters in North Carolina *exceeds* the percentage of matched voters relied upon the three-judge court which precleared the South Carolina photo identification law. (J.A. 24572 (Op. p. 94))

The district court also found that Dr. Stewart's no-match list purports to show only those persons he could not match – not persons who actually lack qualifying identification. (*Id.*; J.A. 24585 (Op. p. 107)) Even if all the persons on

Dr. Stewart's December 2015 no-match report lack qualifying identification, the evidence shows that the number who wish to vote and will be required to use the reasonable impediment option will be "very low." (J.A. 24572 (Op. p. 94))  Out of Dr. Stewart's December 2015 report, 52,765 have been removed from the voter rolls as part of the SBE's normal list maintenance. (*Id.*)  The remaining 172,098 persons were sent a letter by the SBE asking them if they lack a qualifying identification.  (J.A. 24573-24573 (Op. pp. 94-95)) Defendants' expert, Dr. Janet Thornton analyzed the voting history of the 172,098 persons on Dr. Stewart's no-match list who have not been removed from the SBE voter rolls.  (J.A. 24573 (Op. p. 95)) Dr. Thornton found that 69.8% of these voters did not vote in 2012 or 2014 and that 39.5% have never voted. (*Id.*) Broken down by election, 92.6% did not vote in the 2012 primary, 72.1% did not vote in the 2012 presidential election, 96.3% did not vote in the 2014 primary, and 87.8% did not vote in the 2014 general election. (*Id.*)

As of December 30, 2015, 45,692 of the SBE's mailings of Dr. Stewart's list had been returned to the SBE: 38,815 were returned because they could not be delivered to the addressee at the address listed in the SBE registration rolls, and 4,992 advised that they had qualifying photo identification.  (*Id.*) Only 30.1% of those who said they have qualifying identification did not vote in the 2012 presidential election. (*Id.*) This is consistent with the turnout in that election where

67.2% of registered African American voters turned out as compared to 60.4% of registered whites. (*Id.*)

Defendants' expert, Dr. Trey Hood, testified on the use of the reasonable impediment option in South Carolina elections in 2014. (J.A. 24574 (Op. p. 96)) Reasonable impediment declarations were cast at a rate of only 1.1 for every 10,000 voters. (*Id.*) The court found that this evidence suggested that no more than a fraction of a percent of voters were likely to cast reasonable impediment declarations in North Carolina, a result that was borne out by the results of the 2016 March primary in North Carolina. (*Id.*)

The court also found that the characteristics of individuals on Dr. Stewart's no-match list raised serious questions about its reliability. (*Id.*) North Carolina did not begin to ask applicants for registration to provide the last four digits of their social security number ("SSN4") until 2004. (J.A. 24575 (Op. p. 97)) Half of the persons on Dr. Stewart's no-match list registered before 2004. Not surprisingly, SBE lacked the SSN4 for 59.4% of persons on Dr. Stewart's no-match list as compared to only 14.6% of all registered voters. (*Id.*) At least nine of Dr. Stewart's sweeps used SSN4 as a data field. (*Id.*)

The district court identified many other errors in Dr. Stewart's methodology. (J.A. 24577-24578 (Op. pp. 99-100)) For instance, Dr. Stewart did not perform a manual review of his December 2015 report but did perform a

23

limited "informal review" of his initial no-match list. (*Id.*) Dr. Stewart manually reviewed only fifty persons from his original no-match list and found that 10 to 15% were incorrectly listed on the no-match list (or, false negatives). (J.A. 24576 (Op. p. 98)) In contrast, Dr. Stewart manually reviewed 100 persons on his matched list for each of his sweeps. Thus, in his attempt to find "false positives," or persons who were improperly matched, Dr. Stewart manually reviewed 3,600 persons initially included in his "matched list" but only found 50 "false positives" (1%). (J.A. 24575-24577 (Op. pp. 97-99))

The district court also made extensive factual findings demonstrating that SBE's administration of the reasonable impediment option will not deny minority voters an equal opportunity to vote as compared to white voters. (J.A. 24579-24608 (Op. pp. 101-130)) Further findings were made regarding the unprecedented educational campaign conducted by the SBE to identify and inform registered voters of the photo identification and reasonable impediment rules, and to assist those voters who may lack acceptable qualifying identification. (J.A. 24579-24608 (Op. pp. 101-130)) SBE also conducted extensive training efforts to ensure that CBEs and their poll workers effectively implement the photo identification requirement and reasonable impediment exception. (*Id.*)

24

<u>Pre-registration</u>

Ever since the ratification of the Twenty-Sixth Amendment in 1971, a person who would be 18 years old on the next general election day could register to vote in North Carolina for the general election and for any primary for that election, even if the person would not be 18 at the time of the primary. N.C. Gen. Stat. §§ 163-55(a)(1), 163-59. In 2009, the General Assembly enacted a law allowing "pre-registration" of 16- and 17-year-olds who would not be 18 before the next election. 2009 N.C. Sess. Law 541 § 7(a). Under this law, the pre-registrant would be "automatically registered upon reaching the age of eligibility following verification of the person's qualification and address in accordance with [§] 163-82.7." Session Law 2009-541 also mandated that CBEs conduct pre-registration drives. (J.A. 24499-24500 (Op. pp. 21-22)) Only eight states and the District of Columbia allow pre-registration by those age 16 or older. North Carolina's pre-registration law was in place for only two general elections in 2010 and 2012. (J.A. 24669 (Op. p. 191))

When available, a total of 152,000 adolescents pre-registered. (*Id*.) Plaintiffs produced no evidence of how many would have registered without pre-registration. (*Id*.) Pre-registration did not benefit either party. (*Id*.) In 2010, 23% of those who pre-registered were African American. (*Id*.) In 2012, 30% were African American. (J.A. 24669-24670 (Op. pp. 191-192)) Evidence regarding the racial demographics

25

of those who used pre-registration was not before the General Assembly when it enacted SL 2013-381. (J.A. 24868 (Op. p. 390))

Plaintiffs' expert, Sunshine Hillygus, studied the effect of pre-registration on young voter patterns in Florida and nationally. (J.A. 24670 (Op. p. 192)) She concluded that states with pre-registration experienced an increase in youth turnout. She did not find that pre-registration benefits any particular race and that it was equally effective for various groups including whites versus minorities. (J.A. 24670-24671 (Op. pp. 192-93))

There is no evidence that a voter can be "habituated" to pre-registration because it is a one-time event. (J.A. 24672-24673 (Op. pp. 194-95)) Because a segment of pre-registrants are mobile, they have an increased likelihood of facing the additional barrier of re-registering when they turn 18. (*Id.*) This could be because the pre-registrant and his family change addresses between the time of pre-registration and the age of majority (in which case he fails statutory mail verification which is not initiated until the pre-registrant is entitled to vote) or because the pre-registrant moves out of the county (by, for instance, going to college). (*Id.*) In either case, the pre-registrant will need to re-register in his new county. (*Id.*)

The evidence does not explain why African Americans were more likely to use pre-registration or why other methods of registration are less available to

African Americans than other groups. (J.A. 24673 (Op. p. 195)) North Carolina continues to offer substantial registration opportunities for 17–year-olds to register ahead of any election for which they are eligible, including primaries when they are age seventeen. (J.A. 24673-24674 (Op. pp. 195-96))

## SUMMARY OF ARGUMENT

The district court's decision is primarily based on its factual findings and assessment of the evidence. These findings may not be disturbed unless they are clearly erroneous. For this reason, plaintiffs failed to prove that SL 2013-381 is an unconstitutional burden on any voters, much less African American voters. As to their Section 2 claims, plaintiffs' failure to meet their evidentiary burden extends to both prongs of this Court's test from *LWVNC*. Finally, plaintiffs' claims of intentional or purposeful discrimination (based on race or age) are baseless and rely on evidence rejected by the district court.

## ARGUMENT

### I.    Standard of Review.

"In a bench trial [the Fourth Circuit] review[s] the district court's factual findings for clear error and its legal conclusions de novo." *FTC v. Ross*, 743 F.3d 886, 894 (4th Cir. 2014) (citing *Helton v. AT&T, Inc.*, 709 F.3d 343, 351 (4th Cir. 2013)). "In cases in which a district court's factual findings turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial,

such findings are entitled to even greater deference." *Id*. "Although a different fact-finder may have come to a contrary conclusion from that reached by the experienced district judge in this case, the 'rigorous' clear error standard requires more than a party's simple disagreement with the court's findings." *Id*. (citing *PCS Nitrogen, Inc. v. Ashley II of Charleston, LLC*, 714 F.3d 161, 174–75 (4th Cir. 2013)).

The Supreme Court has "stressed" that the "clearly-erroneous standard of review is a deferential one, explaining that '[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Amadeo v. Zant*, 486 U.S. 214, 223 (1988) (citing *Anderson v. Bessemer Cty.*, 470 U.S. 564, 573-74 (1985)). Thus, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id*. at 226.

Plaintiffs cannot and do not dispute the district court's view of the evidence. They would simply make different inferences from the evidence. Under the Fourth Circuit's and Supreme Court's established standard of review, this is not enough to reverse the district court's judgment.

## II.    Plaintiffs' Fourteenth Amendment Claims Fail.

Voting is fundamentally significant "under our constitutional structure." *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979).  However, the right to vote in any manner is not "absolute." *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986).  Under the Elections Clause, states retain "the power to regulate [their own] elections." *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973).  "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections . . ." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  There "must be a substantial regulation of elections . . . if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

Election laws will always impose some type of burden on a voter. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).  Requiring "strict scrutiny" for every election regulation "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433.  Instead, a "more flexible standard applies." *Id.* at 434.  When the right to vote is subjected to "severe" restrictions, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).  "But when a state election law provision imposes only 'reasonable, non-discriminatory restrictions' upon the First and Fourteenth

Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788 and n. 9).

In *Crawford v. Marion Cnty. Elections Bd.*, 553 U.S. 181 (2008), in rejecting a Fourteenth Amendment challenge to Indiana's voter identification requirement, the Court held that "even-handed restrictions that protect the integrity and reliability of the electoral process itself are not invidious" regulations subject to strict scrutiny.[7]  *Id.* at 189-90.  Instead, in reviewing non-invidious election laws, a court is required to "weigh the asserted injury to the right to vote against the 'precise interests put forward by the state as justification for the burden imposed by its rule.'"  *Id.* at 190 (quoting *Burdick*, 504 U.S. at 434).

The *Crawford* Court accepted as justifications for the election law changes that the NVRA, 42 U.S.C. § 1973gg *et seq.* (2012), transf. to 52 U.S.C.A. § 20501 *et. seq.* (2015), has had the effect of inflating the lists of registered voters, that federal law imposes identification requirements on all states and voters in some circumstances, and that voter fraud occurs and can affect close elections.  Indiana

---

[7] The actual holding of *Crawford* is the following: "When we consider only the statute's broad application to all Indiana voters we conclude that it 'imposes only a limited burden on voters' rights.'  The 'precise interests' advanced by the State are therefore sufficient to defeat petitioners' facial challenge to SEA 483."  *Crawford*, 553 U.S. at 202-03 (internal citations and quotations omitted).  The foregoing statement received the support of six Justices.  To the extent that the opinion of Justice Stevens addressed the impact of election laws on classes or subgroups of voters, that language was plainly dicta and not controlling.

30

had rational and legitimate reasons to adopt its photo identification requirement, even in the absence of any evidence of voter fraud "actually occurring in Indiana at any time in its history." *Id.* at 195. Photo identification advances the "interest in orderly administration and accurate record keeping and provides a sufficient justification for carefully identifying all voters participating in the election process." *Id.* at 196. The Court also found that Indiana's photo identification requirement had the general effect of protecting "public confidence 'in the integrity and legitimacy of representative government.'" *Id.* at 197 (citations omitted). In contrast to these legitimate public interests, the *Crawford* Court held that any burdens on voters resulting from Indiana's photo identification requirement were "neither so serious nor so frequent as to raise any question about the constitutionality" of the statute. *Id.*

There are no material differences between the important public interests served by Indiana's identification requirement and the election changes challenged by plaintiffs. Under this standard, none of the long-standing election law practices historically followed by North Carolina and reinstated by SL 2013-381 impose severe restrictions on the right to vote.

There is nothing in the Constitution, or any law passed by Congress, requiring states to allow "early voting" prior to election day or to allow new voters to register and vote at the same time during an early voting period. To the

contrary, the Supreme Court has held that states may close registration at a reasonable time before an election. *Marston v. Lewis*, 410 U.S. 679, 681 (1973); *Burns v. Fortson*, 410 U.S. 686 (1973). This is because closing registration before an election serves an important state interest "in accurate voter lists." *Burns*, 410 U.S. at 687 (quoting *Marston*, 410 U.S. at 681). Congress has also recognized the important state interest in legislation that permits a state to close its registration books up to 30 days before an election. *See* 52 U.S.C.A. § 10502(d) (2015); 52 U.S.C.A. § 20507(a)(1).

These same principles apply to early voting. No federal law requires *any* type of early voting. Early voting is purely an accommodation to voters. North Carolina could eliminate all forms of "early voting" but instead has elected to continue its early voting accommodation to voters for a ten-day period. Plaintiffs offer no guidelines on what would constitute a legally sufficient number of days for "early voting" versus an illegal reduction. While 45 days of early voting – or even the 60 days North Carolina allows for no-excuse absentee voting by mail – might be seen as *preferable* to 17 days, plaintiffs cannot claim that North Carolina *must* expand the days for early voting over and above 17 days. The amount of time a state decides to provide voters for an early-voting accommodation is a policy decision left to state legislatures under the Elections Clause. Under SL 2013-381, "any burden on voters' freedom of choice and association is borne only

by those who fail" to apply for and cast a no-excuse, mail-in absentee ballot or who fail to appear and vote during the ten-day period of one-stop voting that now may be scheduled by each CBE. *Burdick*, 504 U.S. at 436-37. In short, under SL 2013-381, voters still retain many options that allow them to vote at times other than on election day.

These same principles also apply to OOP voting. Congress has directed that voters who cast OOP ballots shall have their votes counted in accordance with state law. 52 U.S.C.A. § 21082(a)(4). Prior to 2005, North Carolina law precluded voters from OOP voting unless they had moved just prior to the election. *See James v. Bartlett*, 359 N.C. 260, 267, 607 S.E.2d 638, 642 (2005). This requirement did not violate federal law when it was in effect. Requiring voters to cast their ballots in the precinct where they reside promotes sound election administration and avoids disputes over the offices for which an out-of-precinct voter is eligible to vote. Requiring election day voters to vote in their assigned precinct also means that fewer voters will be disenfranchised because only when voters vote in their assigned precinct are they assured of having the opportunity to vote for *all* of the legislative or local races for which they are eligible to vote.[8]

---

[8] This restriction does not apply to voters on election day who have not reported a change of their residence outside of the 30-day period prior to a general election. These voters will continue to be allowed to vote using a provisional ballot.

As with early voting, plaintiffs fail to explain any limiting principles on the "right" to vote out-of-precinct. If there is no rational reason for requiring voters to vote in the precinct of their residence, there can be no rational reason for making voters vote in the county of their residence. Clearly, such an argument would be just as baseless as plaintiffs' contentions that the Fourteenth Amendment bars a state from requiring election day voters to vote in the precinct of their residence.

The decision by the 2005 General Assembly to allow voters within a county to vote in a precinct other than the one in which they resided was an accommodation to voters, albeit one with a substantial administrative burden on election officials; it was not required by the Constitution. Requiring all election day voters to vote in the precinct of their residence, a rule authorized by Congress and followed by a majority of the states, does not create a "severe burden" on the right to vote.

These same principles apply to preregistration of 16- and 17-year-olds. This, too, was an accommodation provided by the General Assembly. While opinions may differ as to whether it has any merit as public policy, it is not required by the Fourteenth Amendment, so long as the State retains voting regulations that allow new voters to register and vote in time for any general election that is held after they turn 18, and no claim about SL 2013-381 is made otherwise.

34

Finally, taking all of these changes into account cumulatively does not produce a different result. The photo identification requirement in North Carolina is more accommodating than the requirement in *Crawford*. The remaining challenged provisions are at most a scaling back of accommodations to voters in the number of extra opportunities to vote and register to vote.[9]

---

[9] Plaintiffs argue that the court below and not the legislature invented rationales in support of the challenged provisions. Plaintiffs' arguments are not supported by the cases they rely upon. In *Arlington Heights v. Metro Housing Dev. Corp.*, the Court stated that contemporaneous statements can be considered in evaluating discriminatory intent. 429 U.S. 252, 268 (1977). In *Gingles*, the Court stated that after plaintiffs have demonstrated the *Gingles* preconditions, a court can then consider the totality of the circumstances including whether the state's explanation of a challenged law is tenuous. *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986). Plaintiffs seem to conflate these two different standards for two different claims. Nothing in *Arlington Heights* or *Gingles* states that supporters of legislation must detail every single policy advanced by the challenged statute. This would be an impossible standard given that states often have no legislative history for statutes that might be challenged. "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Schweiker v. Wilson*, 450 U.S. 221, 230 (1981); *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 174-175 (1980). "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Id.* (internal citations omitted). Absent a showing to the contrary, it must be presumed that a state legislature acted in good faith in the enactment of legislation. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995). In any case, plaintiffs ignore the justifications explained by supporters of H.B. 589 during the legislative process for each of the practices plaintiffs challenge. (J.A. 24510-24511 (Op. pp. 32-33))

### III.    Plaintiffs' Section 2 Claims Fail.

Plaintiffs argue that SL 2013-381 violates Section 2 because it results in a discriminatory burden.  Plaintiffs' arguments would require this Court to ignore its own legal standard set forth in *LWVNC*.  The State violated Section 2, in their view, because of two unrelated facts: (1) African Americans' disparate use of the challenged practices and alleged disparate lack of photo identification, and (2) African American socioeconomic disparities.  Plaintiffs juxtapose disparate use of election procedures with socioeconomic disparities, despite presenting no evidence of any connection or link between the two, and ask this Court to pronounce this a violation of federal discrimination law.  The implications for this baseless argument are enormous.

Most fundamentally, it ignores the fact that a disparate impact alone has never been held sufficient to state a vote denial claim under Section 2.  *Irby v. Va. State Bd. of Elections*, 889 F.2d 1352, 1353 (4th Cir. 1989); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1228 (11th Cir. 2005) ("Despite its broad language, Section 2 does not prohibit all voting restrictions that may have a racially disproportionate effect.").

More recently, in *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014), the Seventh Circuit dismissed plaintiffs' challenge to Wisconsin's photo ID law.  The Court refused to find a violation of Section 2 based upon similar evidence because

"units of government are responsible for their own discrimination but not for rectifying the effects of other persons' discrimination." *Id*. at 753. The plaintiffs were obligated to prove "that the challenged 'standard, practice, or procedure' [imposes] a discriminatory burden on members of the protected class, meaning that members of the protected class 'have less opportunity than other members of the electorate to participate in due political process and to elect representatives of their choice.'" *Id.* at 754-55 (citations omitted). Based upon arguments similar to those made by the defendants here, the Seventh Circuit concluded that plaintiffs could not prove a violation of Section 2 "because in Wisconsin everyone has the same opportunity to get a qualifying ID." *Id.* at 755.

In *LWVNC*, this Court characterized the Section 2 "effects" test differently than the Seventh Circuit in *Frank*. It stated the test as follows in the vote denial context:

• First, "the challenged 'standard, practice, or procedure' must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 553 (6th Cir. 2014) (internal quotations omitted), *vacated*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014);

37

• Second, that burden "must in part be caused by or linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class." *Id.* (quoting *Gingles*, 478 U.S. at 47). [10]  *LWVNC*, 769 F.3d at 240.   The *LWVNC* court also stated that the Senate Factors from *Gingles* may "shed light" on the analysis.  *Id.* (citing *Gingles*, 478 U.S. at 44-45).

Assuming that the Senate Factors are relevant to a claim for vote denial under Section 2, and that the standard from *Frank* is not applicable, the challenged provisions of SL 2013-381 still do not have a discriminatory effect.

First, the initial prong of the *LWVNC* test requires plaintiffs to prove that the election law "impose[s]" a "discriminatory burden" on a minority group, which means the group has an unequal opportunity to participate in elections as compared to non-minority groups.  Plaintiffs did not prove this prong of the test. Instead, they repeatedly revert simply to African American disparate use of SDR, OOP, early voting, pre-registration, and supposed disparate possession rates of photo identification.  But disparate use alone proves nothing.  Plaintiffs failed to prove that the election practices adopted by the State caused the disparate participation rates or increased turnout among African American voters as opposed to non-state factors such as campaign spending and strategy by non-state actors.  Indeed, the United States concedes as much: "[t]urnout in any particular

---

[10] Significantly, this two-pronged test comes from the *Husted* decision which was later vacated.

38

election is driven by many factors, including the offices on the ballot, the competitiveness of the election, total campaign spending, get-out-the-vote efforts, and overall voter interest. Indeed, *these other factors typically have a greater effect on aggregate turnout than do changes in election laws*." (Doc. 88, p. 37) (emphasis added) (internal citations omitted). If forces other than the election laws themselves are what drive turnout and participation, then the elimination of the election practices at issue in this case, by definition, cannot by itself constitute a discriminatory burden.[11]

Second, plaintiffs failed to prove the next prong of this Court's test: that the supposed discriminatory burden was "caused by or linked to" African American socioeconomic disparities. While the district court found that such disparities exist in North Carolina, that does not end the analysis, as plaintiffs would like.

---

[11] Plaintiffs argue that the number of SDR voters who cast illegal votes should be compared to the number of voters who allegedly were denied the right to register during the 10 day early voting period for the 2014 general election. This is a false comparison because it is based upon testimony by Dr. Stewart that was not credible. First, Dr. Stewart admitted that he did not know whether the time recorded by SBE for these registrants represents the date they applied for registration or the date the registrations were processed. Dr. Stewart did not know whether these applicants applied in person at early voting centers or by mail or through the internet. Dr. Stewart also did not know how many of these registrants were registering for future elections because they were not eligible to vote in 2014. Nor did Dr. Stewart compare his calculation against the number of registrants who registered during early voting in 2010 who were not able to vote because they did not use SDR. Even assuming all of the registrants identified by Dr. Stewart during the 2014 early voting period attempted to register at early voting sites, there was no disparate impact because only 22.5% were African Americans. (J.A. 24651-24660 (Op. pp. 173-176))

The existence of a socioeconomic disparity alone cannot create a Section 2 violation where none would otherwise exist. Instead, this Court's test requires the plaintiffs to make a *connection* between the socioeconomic disparities and the disparate use of the election practices. Plaintiffs did not provide any evidence making such a connection, which is not surprising. The facts found by the district court show that minority voters used these repealed practices because early voting, SDR, and OOP voting were targeted by the Obama campaign and organizations dedicated to turning out minority voters as part of their get out the vote strategies. (J.A. 24646, 24679-24700 (Op. pp. 168, 201-22)) The district court also found that in 2014 groups committed to turning out minority voters altered their turnout strategies and minority voters as a group easily adjusted to and navigated the election practices established by SL 2013-381. (J.A. 24672 (Op. p. 194)) Further, the facts found by the district court show that use of early voting by African Americans during the 2014 general election increased as compared to 2010 and that overall African American turnout increased for all voters in 2014. (J.A. 24618 (Op. p. 140)) The actual evidence concerning the impact of SL 2013-381 shows more than equal opportunity for African Americans as a group to register to vote

and participate in the political process. Thus, the actual implementation of SL 2013-381 caused no injury whatsoever to African American voters.[12]

Moreover, the plaintiffs' own evidence demonstrated that well over 90% of African Americans vote in their correct precinct, register within 25 days of an election, and possess acceptable photo identification for voting. For instance, 99.67% of African Americans voted ballots other than OOP ballots in the 2012 general election, and this increased to 99.9% in the 2014 general election. Obviously, there are many African Americans within that 99.67% (or 99.9%) who experience socioeconomic disparities, yet they do not use OOP voting. The fact that only .33% (or .17%) used OOP voting demonstrates that the use of that election practice is not caused by the socioeconomic disparities. Going a step further, plaintiffs were aware of the specific individuals who used OOP voting in 2012 and 2014, as well as those who voted in the first seven days of early voting, used SDR, and could not be matched to an acceptable photo identification. Plaintiffs could have provided evidence about the socioeconomic status of these individuals and its impact on their use of these practices. For whatever reason, plaintiffs failed to do so. As a result, the district court did not have the evidentiary

---

[12] Section 2 of the VRA protects the voting rights of a minority group, not individuals. *Bartlett v. Strickland*, 556 U.S. 1, 14-16 (2009); *Gingles*, 478 U.S. at 50, 88; *Holder v. Hall*, 512 U.S. 874, 880 (1994); *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 479 (1997); *Hall v. Virginia*, 385 F.3d 421, 427-28 (4th Cir. 2004).

41

basis to conclude that plaintiffs met the second prong of this Court's test, and this Court cannot now fill that evidentiary void for plaintiffs.

Indeed, all of the challenged practices in this case, including the photo identification requirement would be precleared under Section 5. Disparities alone do not violate Section 5. More specifically as to the photo identification requirement, under Section 5 disparities in identification possession would not preclude the preclearance of North Carolina's photo identification/reasonable impediment rule as demonstrated by the preclearance of South Carolina's nearly identical statute. *See South Carolina*, 898 F. Supp. 2d at 40; (J.A. 24870-24871 (Op. pp. 392-393))

The other challenged practices would be precleared because of the undisputed evidence that they had no adverse effect on the ability of African Americans to participate in voting, as evidenced by turnout in the 2014 election.[13] Throughout this case, plaintiffs have taken inconsistent positions on the relevance of turnout. Time and again they have relied upon increased minority registration and turnout during the 2008 and 2012 election but then say registration and turnout

_____

[13] Plaintiffs argue that the district court relied too much on the results of one election. But plaintiffs ignore that the burden of proof is on them, not the defendants (or the district court). None of the dire consequences predicted by plaintiffs in support of their preliminary injunction motion came to pass. Plaintiffs could have offered expert testimony on how registration rates and turnout increased because of the repealed or modified practices or how turnout in 2014 would have been higher if the prior practices were still in place. They declined to offer this expert testimony despite the numerous expert witnesses offered by them.

results should be ignored for the 2014 election. This is a double standard which should be rejected by this Court. Plaintiffs have failed to offer any evidence that the practices in place in 2008, 2010 and 2012 caused or led to an increase in minority turnout. It is hard to fathom how a statute that would be precleared under Section 5, with the burden of proof on defendants to show the absence of retrogression or purposeful discrimination, could ever violate Section 2 where the plaintiff is required to prove that the election practice deprives minority voters of equal opportunity.

Moreover, if this Court allows plaintiffs to prove a violation of Section 2 by merely juxtaposing disparate use statistics with evidence of socioeconomic disparities, it will have grafted onto Section 2 a standard more onerous than the retrogression standard of Section 5 and there will be no end to the remedies that can be imposed by a federal court. For example, in the 2014 general election, the evidence at trial showed that a total of 6790 persons cast provisional ballots because there was no record of their registration. Race could not be determined for 1,160 of these voters while race could be determined for 5630 voters. Out of this category of provisional ballots for which race could be identified (5630), a total of 1,685 or 30% were black. (J.A. 8427) All of the same arguments made by plaintiffs in support of their argument that OOP violates Section 2 are equally applicable to provisional votes cast for "no record of registration." Thus, a future

litigant could argue that because African Americans have lower educational and economic attainments, African Americans who cast provisional votes for "no record of registration" were disproportionately burdened  in the same way as African American voters who disproportionately voted OOP provisional ballots.  Under this theory, why would African Americans who voted OOP ballots be entitled to a remedy under Section 2 while African Americans who voted "no record of registration" provisional ballots would not? The only difference is that North Carolina once allowed OOP ballots but has never allowed election day registration. The interpretation sought by plaintiffs would transform Section 2 into an even more onerous version of Section 5.

### IV.    Plaintiffs' Intentional Discrimination Claims Fail.

This Court should affirm the district court's findings of fact that North Carolina did not act with discriminatory intent because those findings are not clearly erroneous.

First, in its original opinion in this case, this Court stated that the district court should consider "past practices" when evaluating a claim under Section 2. *LWVNC*, 769 F.3d at 241. "Past practices" include not only election practices used by North Carolina prior to the enactment of SL 2013-381, but also practices followed by North Carolina before it enacted the practices repealed or modified by SL 2013-381.

44

In person early voting was not available to any voter in North Carolina until 2000. (J.A. 24491 (Op. p. 13)) OOP voting did not become available to voters until 2005, SDR was not provided until 2008, and pre-registration of 16-year-olds was not available until 2009.  (J.A. 24496-24499 (Op. pp. 18-21))  The practices existing prior to these accommodations represented the majority rule among the states in 2000, 2005, 2008 and 2009. (J.A.  24638 (Op. p. 160 & n. 94), 24662 (Op. p. 184 & n. 112), 24801 (Op. p. 323), 24910 (Op. p. 432), 24939 (Op. p. 461)) Plaintiffs presented no evidence that North Carolina adopted early voting, OOP voting, SDR or pre-registration of 16-year olds to avoid liability under Section 2 or the Fourteenth Amendment. No state has ever been found in violation of Section 2, or the Fourteenth or Twenty-Sixth Amendments because it required voters to vote in person on election day, register a certain number of days before an election, vote in an assigned precinct, or did not allow 16-year-olds to pre-register.[14]

Next, the district court followed the test from *Arlington Heights*, 429 U.S. at 266, in making its findings that North Carolina did not act with discriminatory intent when it enacted SL 2013-381. (J.A. 24861-24896 (Op. pp. 383-418))  These findings of fact are not clearly erroneous and show the complete absence of discriminatory intent by North Carolina.

---

[14] Indeed, even today, many states, including New York which previously had areas covered by Section 5, continue to observe registration cut-off dates and make voting available only on election day. (J.A. 24951 (Op. p. 473))

First, as explained above, the district court correctly rejected plaintiffs' argument that intentional discrimination can be established merely from evidence of disproportionate use of the practices. (J.A. 24863 (Op. p. 385)) Nor was intentional discrimination demonstrated simply because a few members of the General Assembly made inquiries of the SBE for demographic information on voters who used SDR or voted by provisional ballots. (J.A. 24863-24867 (Op. pp. 385-89)) Making these inquiries was a reasonable and responsible inquiry given the State's potential liability under Section 2 or Section 5. (J.A. 24866-24867 (Op. pp. 388-89)) Even the United States could not tell the court whether it was better or worse for legislators to request this demographic information. (*Id.*)

Democratic Senator Stein presented evidence of disproportionate use of early voting and SDR by African American voters. Stein did not provide evidence that African Americans disproportionately used OOP voting or pre-registration. (J.A. 24867-24868 (Op. pp. 389-90)) Because Senator Stein presented this evidence only during the final legislative debates, this evidence merely shows that the General Assembly eliminated SDR and reduced the number of days for early voting *despite* the evidence of disparate use of early voting and SDR by minorities, not *because of* that disparate use. (*Id.*)

Plaintiffs also rely heavily upon reports prepared by SBE which attempted to match voters in the SBE database against persons who had been issued an

46

acceptable form of photo identification by the DMV in the DMV database. (J.A. 24869-24871 (Op. pp. 391-93)) As explained above, there are many problems associated with attempting to match these two databases. (*See supra* at 17-22) Regardless, these reports only purport to show the number of voters who could be matched with the SBE database. Knowledge that African Americans were included disproportionately in the group of potentially un-matched voters cannot constitute evidence of discriminatory intent.

Moreover, the SBE matching reports themselves state that these reports almost certainly inflated the number of un-matched voters. (J.A. 24873 (Op. p. 395)) and the SBE advised the General Assembly of this fact. The district court found that the predicted inflation of the SBE no-match list was confirmed by evidence showing that the no-match lists calculated by plaintiffs' expert Dr. Stewart were highly inflated. (J.A. 24814, 24870 (Op. p. 336, 392 & n. 214))

Testimony before the legislature also indicated that no-match reports done in other states had highly inflated the number of voters who allegedly lacked photo ID and that minority turnout had increased in states that had adopted photo ID requirements. Testimony before the General Assembly also demonstrated that except in rural areas with precincts including a smaller number of voters, poll workers in urban areas no longer could identify voters based upon their own personal knowledge. Evidence before the General Assembly also indicated that a

47

majority of North Carolinians supported the State's decision to adopt a photo identification requirement. (J.A. 24873-24876 (Op. pp.395-98)) And as conceded by plaintiffs' expert, Dr. Kousser, the length of North Carolina's rollout period was the longest in the nation as compared to other states that had adopted photo identification requirements. (*Id.*) North Carolina's decision to adopt an unprecedented length of time before photo identification requirements could be implemented was consistent with the recommendations of the Carter-Baker Commission cited by the Supreme Court in *Crawford* and is completely inconsistent with any intent to engage in intentional discrimination. (J.A. 24878-24879 (Op. p. 400-01))

Plaintiffs also rely heavily on expert reports to prove their claims of intentional discrimination but the court below carefully considered these reports and found them not to be credible. (J.A. 24876-24882 (Op. pp. 398-404)) The court first rejected these reports as mainly consisting of improper legal conclusions. (J.A. 24876-24878 (Op. pp. 398-400))

The district court found particularly incredible the testimony of plaintiffs' main witness on legislative intent, Dr. Allan Lichtman. The court found that Dr. Lichtman's testimony was "single minded" because he "purposely excluded evidence that contradicted his opinion." (J.A. 24878-24879 (Op. pp. 400-01)) Dr. Lichtman purported to compare North Carolina to other jurisdictions when the

comparison supported his conclusion of illegal intent but omitted comparisons that did not support his conclusion. For example, Dr. Lichtman did not make any comparison between North Carolina's soft rollout of photo identification with other jurisdictions nor did he testify on North Carolina's decision to exempt curbside voters from the requirement, an exemption that benefited minority voters because they disproportionately use curbside ballots. (*Id.*) Dr. Lichtman ignored that legislators of different parties could have legitimate policy disagreements and demonstrated a propensity to respond to questions not with responsive answers but instead with non-responsive arguments purporting to support his position. (J.A. 24880 (Op. p. 402)) Because Dr. Lichtman presented as an "advocate" and not as an expert witness, the district court found that Dr. Lichtman's testimony was not credible or reliable. (*Id.*)

The court also found the absence of any evidence of a consistent pattern of actions by the General Assembly that disparately impacted any minority group. (J.A. 24882-24883 (Op. pp. 404-05)) Nor was the decision to move forward with H.B. 589 shortly after the decision in *Shelby County* evidence of discriminatory intent. The court found that it was reasonable for the General Assembly to delay the enactment of H.B. 589 until *Shelby County* clarified the General Assembly's remaining obligations, if any, under Section 5. (J.A. 24885-24886 (Op. pp. 407-08)) Moreover, the General Assembly knew that photo identification laws in other

states had passed legal muster and that all of the other challenged practices required under SL 2013-381 had formerly been followed in North Carolina, represented the majority rule nationwide, and were parts of other prior and pending bills before the General Assembly. (*Id.*)

Nor was the legislative process shortchanged or unusual as compared to past practices and bills enacted by the General Assembly. (J.A. 24887-24893 (Op. pp. 409-15)) No points of order were ever raised by those who opposed the legislation. (*Id.*) All aspects of the process were similar to the way many other bills had been handled including the process followed by the Democratic majority when the legislature enacted the 2003 legislative redistricting plan. (*Id.*) Plaintiffs focus their arguments on the process followed in the Senate but ignore the statements by the minority leader made at the end of the Senate's proceedings complimenting the Republican leader for "a good and thorough debate" and admitting that "everyone in the room knows what we are doing." (J.A. 24888 (Op. p. 410)) Plaintiffs also completely ignore that the legislature accepted several ameliorative amendments to H.B. 589 offered by members of the minority party, including Senator Stein's very significant amendment to the early voting changes. (J.A. 224891 (Op. p. 413)) Plaintiffs cite to no case where any decision-making body was found guilty of intentional discrimination where the body followed all of its rules of procedure, did not depart from past precedent for the handling of other bills, and accepted

significant amendments designed to ameliorate any alleged discriminatory impact on minority groups.

The district court also found as a matter of fact that the policy reasons for the changes made by SL 2013-381 were not tenuous. (J.A. 24892-24893 (Op. pp. 414-15)) The court also considered the "cumulative effect" of all of the changes. It found that the early voting opportunities available under SL 2013-381 were "materially the same" as the early voting opportunities before the bill was enacted and that plaintiffs' intentional discrimination arguments rested mainly on the elimination of SDR, OOP voting and pre-registration. (J.A. 24894-24895 (Op. pp. 416-17)) There was no evidence before the General Assembly of disparate use by minorities of pre-registration. While there was evidence of disparate use of provisional ballots by minorities, neither Senator Stein nor any other member who opposed H.B. 589 introduced evidence of disparate use of OOP voting by minorities. In any case, the State advanced non-tenuous reasons to eliminate SDR and OOP voting. (J.A. 24895-24896 (Op. pp. 417-18)) The State also knew that no voting rights claims had been made against North Carolina in the past when North Carolina did not provide for early voting, SDR, OOP voting or pre-registration, that most states did not provide these practices, and that no state has ever been found in violation of Section 2 or the Fourteenth Amendment because it did not provide for early voting, SDR, OOP voting or pre-registration.

Plaintiffs have failed to cite a single case where a state has been guilty of purposeful discrimination because it enacted photo identification requirements or any of the current election practices implemented by SL 2013-381. This is true even where the evidence in another state showed that minorities possessed qualifying identification at a lower rate than whites. For example, in *Veasey v. Abbott*, 71 F. Supp. 3d 627 (S.D. Tex.), *vacated and remanded*, 796 F.3d 487 (5th Cir. 2015), *petition for rehearing en banc granted*, 815 F.3d 958 (5th Cir. 2016), a panel of the Fifth Circuit reversed and remanded a finding of intentional discrimination made by the district court. Unlike this case, in *Veasey*, the circuit court principally relied upon a factual finding by the district court that hundreds of thousands of minority voters lacked photo identification and that minorities were more likely to lack identification than whites. Despite this finding, the circuit court concluded that discriminatory intent is not demonstrated simply because a legislature knew of the alleged discriminatory impact. 796 F.3d at 488-99.

The Fifth Circuit concluded that the district court had failed to properly apply *Arlington Heights*. The panel stated that the state's purpose for the photo identification requirement "centered on protection of the sanctity of voting, preventing voter fraud, and providing confidence in the election process," the same reasons stated by the supporters of North Carolina's identification requirement. *Id.*

at 499. Significantly, the panel observed that "no one questions the legitimacy of these concerns as motives…." *Id.*[15]

The Fifth Circuit discounted the district court's reliance on the past history of discrimination by Texas as well as examples of discrimination by local and county governments. The panel noted that there had been few examples of recent acts of discrimination.  It discounted recent court decisions finding Texas guilty of racial gerrymandering in the creation of congressional districts since those cases involved acts of the legislature providing minorities with "more representation." 796 F.3d at 499 (citing *Bush v. Vera*, 517 U.S. 952 (1996)). The evidence rejected by the Fifth Circuit is similar to the evidence offered by the plaintiffs here. Plaintiffs introduced into evidence letters issued by the United States pursuant to its authority under Section 5 objecting to election law changes by North Carolina jurisdictions. However, most if not all of these objection letters were issued to local and county governments and bear little relevance "to the intent of legislators" in North Carolina's General Assembly. *Id.* at 500. Moreover, citing a district court's

---

[15] Significantly, this Court has previously recognized prevention of voter fraud as a legitimate state interest. In *Hoffman v. Maryland*, 928 F.2d 646, 649 (4th Cir. 1991), this Court, in rejecting a constitutional challenge to Maryland's voter purge statute, explained that: "[t]he statute in question is designed to curb voter fraud…Without removing…names, there exists a very real danger that imposters will claim to be someone on the list and vote in their places. And the absent voting statutes open the door for fraud by this means. Accordingly, keeping accurate, reliable, and up-to-date voter registration list is an important state interest…Even considering that re-registration may be somewhat burdensome, it is a small price to pay for the prevention of vote fraud." *Id.*

opinion in *Harris v. McCrory*, __ F. Supp. 3d __, 2016 WL 482052 (Feb. 5, 2016 M.D.N.C.) (appeal pending) has no more relevance to discriminatory intent towards minority voters than did *Bush v. Vera* as it relates to the intent of the Texas legislature. 796 F.3d at 499.

The Fifth Circuit also criticized the district court for relying upon a few statements by a few legislators both before and after the bill was enacted. The panel stated that "inquiries into congressional motives or purposes are a hazardous matter…." because "what motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high to eschew guesswork." 796 F.3d at 501 (citing *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968)).   The court also cautioned against reliance on statements by opponents of a bill as not being particularly probative. *Id.* at 502. Moreover, typical legislative squabbles or objections are not sufficient to prove discriminatory intent. *Id.*

Despite the number of court challenges to photo identification statutes throughout the country, no court has found that legislation intended to protect the sanctity of elections, prevent voter fraud or restore confidence in the election system is evidence of intentional discrimination. The district court's findings here

that North Carolina is similarly not guilty of intentional discrimination are not clearly erroneous.[16]

### V.    Plaintiffs' Twenty-Sixth Amendment Claims Fail.

Plaintiffs' Twenty-Sixth Amendment claims ignore one basic fact: nothing in SL 2013-381 can reasonably be construed as denying citizens who are at least 18 years of age, or who will be 18 years of age at the time of the next election, from registering to vote and from voting in that election. As a matter of law, the clear language of SL 2013-381 establishes that the law does not deprive any 18-year-old citizen of the right to vote.  Moreover, no one, including the plaintiffs, has argued that the election practices in place prior to the enactment of SDR, out-of-precinct voting, 17-day early voting, and pre-registration violated the Twenty-Sixth Amendment.

Moreover, a majority of the states do not have these practices.  The enactment of SL 2013-381 simply returned North Carolina to practices that formerly existed, represent the majority rule in states, and have never been

---

[16] Should this Court reverse the district court and find violations of either the Fourteenth Amendment or Section 2, this Court should not re-institute 17 days of early voting, SDR, OOP or enjoin the use of the photo identification requirement. Instead the case should be remanded and the State should be given the first opportunity to remedy any violations. *Veasey*, 796 F.3d at 517-19.  The court in *Veasey* indicated that the Texas law probably would satisfy Section 2 if it was amended to include an accommodation for voters without photo identification similar to the reasonable impediment option available under North Carolina's law. *Veasey*, 796 F.3d at 519. Even under the standard applied by the *Veasey* decision, North Carolina's photo identification requirement would not violate Section 2.

considered to violate the Twenty-Sixth Amendment. Plaintiffs have not cited any case stating otherwise. *See Gaunt v. Brown*, 341 F. Supp. 1187 (S.D. Ohio 1972) (three-judge court) (holding that statute preventing 17-year-old plaintiff who would be 18-years-old at the time of the general election from voting in primary election did not deny plaintiff due process or equal protection and finding that the Twenty-Sixth Amendment "simply bans age qualifications *above* 18") (emphasis added), *aff'd* 409 U.S. 809 (1972). Finally, the district court's findings of fact on plaintiffs' Twenty-Sixth Amendment claims are well founded and not clearly erroneous. Accordingly, these claims are baseless in law and in fact, and this Court should affirm the district court's ruling on them.

## <u>CONCLUSION</u>

For the foregoing reasons, the district court's judgment should be affirmed.

This the 9th day of June, 2016.

NORTH CAROLINA DEPARTMENT
  OF JUSTICE

/s/ Alexander McC. Peters
Alexander McC. Peters
Senior Deputy Attorney General
N.C. State Bar No. 13654
apeters@ncdoj.gov

N.C. Department of Justice
P.O. Box 629
Raleigh, NC  27602
Telephone: (919) 716-6900
Facsimile: (919) 716-6763
*Counsel for Appellees North Carolina and State Board of Election Appellees.*

OGLETREE, DEAKINS, NASH
  SMOAK & STEWART, P.C.

/s/ Thomas A. Farr
L. Gray Geddie, Jr.
S.C. State Bar No. 2397
Thomas A. Farr
N.C. State Bar No. 10871
Phillip J. Strach
N.C. State Bar No. 29456
Michael D. McKnight
N.C. State Bar No. 36932
thomas.farr@ogletreedeakins.com
phil.strach@ogletreedeakins.com
michael.mcknight@ogletreedeakins.com
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone:  (919) 787-9700
Facsimile:  (919) 783-9412
*Co-counsel for Appellees North Carolina and State Board of Election Appellees.*

BOWERS LAW OFFICE LLC

By:  /s/ Karl S. Bowers, Jr.
Karl S. Bowers, Jr.*
Federal Bar #7716
P.O. Box 50549
Columbia, SC 29250
Telephone: (803) 260-4124
E-mail: butch@butchbowers.com
*appearing pursuant to Local Rule 83.1(d)
*Counsel for Governor Patrick L. McCrory*

By:  /s/ Robert C. Stephens
Robert C. Stephens (State Bar #4150)
General Counsel
Office of the Governor of North Carolina
20301 Mail Service Center
Raleigh, North Carolina 27699
Telephone: (919) 814-2027
Facsimile:  (919) 733-2120
E-mail: bob.stephens@nc.gov
*Counsel for Governor Patrick L. McCrory*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*13,836*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: June 9, 2016                           /s/ Thomas A. Farr
                                              *Counsel for Appellees*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 9th day of June, 2016, I caused this Brief of Appellees to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

I further certify that on this 9th day of June, 2016, I caused the required copies of the Brief of Appellees to be hand filed with the Clerk of the Court.

/s/ Thomas A. Farr
*Counsel for Appellees*